## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:12-cv-20271-RNS-TEB

MOTOROLA MOBILITY LLC,

        Plaintiff,

v.

APPLE INC.,

        Defendant.

APPLE INC.,

        Counterclaim Plaintiff,

v.

MOTOROLA MOBILITY LLC,

        Counterclaim Defendant.

**JURY TRIAL DEMANDED**

Consolidated Cases:
Case No. 1:10-cv-23580-RNS
Case No. 1:12-cv-20271-RNS

**DEFENDANT AND COUNTERCLAIM-PLAINTIFF APPLE INC.'S
RESPONSIVE CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................ 1

II.     DISPUTED TERMS IN THE MOTOROLA '072 PATENT............................... 2

    A.    An "Instruction Message That Corresponds To Spoken Instructions" Is
        Distinct From The Spoken Instructions Themselves. ............................................. 2

    B.    The Claims Recite "Database Including One Of A Parameter Status And
        A Mirrored Database Associated With The Subscriber Device," Not "Or.".......... 4

    C.    Both The Specification And Common Sense Confirm That A "Mirrored
        Database" Is Identical. ....................................................................................... 6

III.    DISPUTED TERMS IN THE APPLE PATENTS ........................................... 8

    A.    The '332 Patent ................................................................................................ 8

        1.    "Application Object" Refers To A Graphical Element That
            Includes Information Associated With A Particular Application. .............. 8

            a)    Motorola's "Presents" Limitation Is Redundant And
                Unnecessary. ..................................................................... 8

            b)    If Motorola's "Presents" Limitation Is Not Redundant, It
                Improperly Violates The Doctrine Of Claim Differentiation
                And Imports A Limitation From The Specification Into The
                Claims. .............................................................................. 8

            c)    Apple's Proposed Construction Is Supported By Consistent
                Use Of The Term "Application Object" In The
                Specification. ..................................................................... 9

            2.    Display Object Need Not Be Construed Because Its Plain
               Meaning Will Be Understood By The Jury. ................................. 10

            3.    Means-Plus-Function Claiming Is Rare And Inapplicable
               Here.............................................................................................. 12

            a)    The Limitations Within Claim 13 Do Not Include The
                 Term "Means" And Presumptively Are Not Subject To
                § 112 ¶ 6........................................................................... 14

            b)    Motorola Cannot Overcome The Presumption That § 112
                 ¶ 6 Does Not Apply Because A Person Of Ordinary Skill In
                The Art Understands That A "Mobile Device" Connotes
                Definite Structure........................................................... 14

i

|   | c) | Even If Claim 13 Were Subject To § 112 ¶ 6, The Specification Discloses Sufficient Structure.............................. 18 |
|   | d) | Even If Limitations Within Claim 13 Were Subject To § 112 ¶ 6 And An Algorithm Were Required, The Specification Discloses Sufficient Structure................................ 23 |

B. The '760 Patent ......................................................................... 24

    1. Motorola's Indefiniteness Allegations Should Be Rejected Because The Limitations Within Claims 10 and 11 Are Not Subject To 35 U.S.C. § 112 ¶ 6. ...................................................................... 24

        a) "Instructions For" Is Not Equivalent To "Means For." ............... 25

        b) Courts Have Found Similar Claims Using "Instructions For" Language Not Subject To § 112 ¶ 6. .................................... 26

        c) Motorola Cannot Overcome The Strong Presumption That The Limitations Are Not Subject To § 112 ¶ 6............................ 27

        d) Even Assuming, *Arguendo*, The "Instructions For" Terms Are Subject To § 112 ¶ 6, Adequate Corresponding Structure Is Disclosed. ................................................. 29

    2. Motorola Mischaracterizes The Parties' Dispute Concerning "Completely Substituting Display Of The List Of Interactive Items With Display of Contact Information." ...................................... 30

        a) The Parties Agree The Plain Meaning Of "Completely" Applies. ....................................................................... 31

        b) Any Attempt By Motorola To Further Narrow The Meaning Of "Completely" Should Be Rejected. .......................... 33

        c) Apple's Alternative Proposed Construction Addresses The Real Dispute Between The Parties Regarding "Contact Information." ................................................................ 34

    3. The Specification And Claims Use "Contact Object" To Refer To An Object Associated With Contact Information. ..................................... 35

C. The '050 Patent ........................................................................ 38

    1. The Term "Speed Reference" Means, As The Claims Explicitly State, A "Phone Number." ........................................... 38

a) Apple's Construction Is Drawn From the Claims, Whereas Motorola's Construction is Untethered to the Claim Language................................................................................. 38

b) Motorola's Construction Would Improperly Read A "Push" Limitation Into The Claims And Exclude A Preferred Embodiment.................................................................. 40

c) Because The Query Embodiments Disclosed In The '050 Patent Are Part Of The Preferred Embodiment, Motorola's Construction Impermissibly Reads The Preferred Embodiment Out Of The Claims. .................................................. 42

d) The Prosecution Of Other Patents That Share The Specification Confirm That Where The Patentee Intended To Limit His Claims To "Automatic" Receipt Of Information, He Did So Explicitly................................................. 43

e) Apple's Construction Is Consistent With The Purpose Of The Invention That Was Actually Claimed In The '050 Patent............................................................................... 44

2. The Term "Situational Location" Refers To Any Of The Properties Listed In Apple's Construction................................... 46

a) Apple's Proposed Construction Is Drawn Directly From The Specification, And Motorola Raises No Serious Objections To It. ......................................................................... 46

b) Motorola's Construction Would Read Out Numerous Disclosed Embodiments In Which The "Situational Location" Does Not Include A User's Physical Location. ........... 48

c) Motorola's Requirement That A Situational Location Must Include A Current Location Is Inconsistent With The Prosecution Of Other Patents In The '050 Patent Family............. 49

IV. CONCLUSION................................................................................. 50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Al-Site Corp. v. VSI International, Inc.*
 174 F.3d 1308 (Fed. Cir. 1999)..................................................................................18

*Apex Inc. v. Raritan Comp., Inc.*
 325 F.3d 1364 (Fed. Cir. 2003)..............................................................13, 14, 15,17

*Apple Inc. and NeXT Software Inc. v. Motorola, Inc. and Motorola Mobility, Inc.*
 2012 U.S. Dist. LEXIS 67384 ...........................................................................26, 27,28

*Apple Inc. v. Samsung Electronics Co., Ltd.*
 Case No. 12-cv-630 (N.D. Cal.) April 10, 2013 Claim Construction Order at 32 .................31

*Aristrocat Technolgies Austrial Pty Ltd. V. International Game Technology*
 521 F.3d 1328 (Fed. Cir. 2008)(en banc).................................................28, 29, 30

*Aspex Eyewear, Inc. v. Contour Optik, Inc.*
 288 F. App'x 697 (Fed. Cir. 2008) .......................................................................28

*In re Beauregard*
 53 F.3d 1583 (Fed. Cir. 1995)................................................................25, 26, 27,28

*Blackboard, Inc. v. Desire2Learn Inc.*
 574 F.3d 1371 (Fed. Cir. 2009)..............................................................................30

*CAE Screenplates v. Heinrich Fielder Gmbh & Co. Kg,*
 224 F.3d 1308 (Fed. Cir. 2000)................................................................................2

*CCS Fitness, Inc. v. Brunswick Corp.*
 288 F.3d 1359 (Fed. Cir. 2002)..............................................................................13

*In the Matter of Certain Electronic Digital Media Devices and Components Thereof*
 Inv. No. 337-TA-796, Order No. 16 at *9-16 (ITC Mar. 6, 2012) ..........................................26

*Certain Portable Electronic Devices and Related Software*
 Inv. No. 337-TA-797, Order No. 57, 2012 ITC LEXIS 1835 (ITC June 26, 2012)...........26,27

*Deere & Co. v. Bush Hog, LLC*
 703 F.3d 1349 (Fed. Cir. 2012)..............................................................................9

*Finisar Corp. v. DirecTV Grp., Inc.*
 523 F.3d 1323 (Fed. Cir. 2008)..............................................................17, 28, 29

*Forest Labs. Inc. v. Cobalt Labs. Inc.*
   Case No. 08-cv-21-GMS-LPS, 2009 WL 3010837 (D. Del. Sept. 21, 2009)........................25

*Honeywell v. Universal Avionics Sys.Corp.*
   488 F.3d 982 (Fed. Cir. 2007)...................................................................................39

*Kao Corp. v. Unilever U.S. Inc.*
   441 F.3d 963 (Fed. Cir. 2006)...................................................................................43

*In re Katz Interactive Call Processing Patent*
   639 F. 3d 1303 (Fed. Cir. 2011)................................................................................30

*LG Elecs. Inc. v. Bizcom Elecs. Inc.*
   453 F.3d 1364 (Fed. Cir. 2006).................................................................................45

*Liebel-Flarsheim Co. v. Medrad, Inc.*
   358 F.3d 898 (Fed. Cir. 2004).....................................................................................9

*Lighting World, Inc. v. Birchwood Lighting, Inc.*
   382 F.3d 1354 (Fed. Cir. 2004)..................................................................13, 14,27

*Mass. Inst. Of Tech. v. Abacus*
   462 F.3d 1344 (Fed. Cir. 2006).................................................................................28

*NTP Inc. v. Research In Motion Ltd.*
   418 F.3d 1282 (Fed. Cir. 2005)............................................................................43,49

*Ortho-McNeil Pharmaceutical, Inc. v. Mylan Laboratories, Inc.*
   520 F.3d 1358 (Fed. Cir. 2008)...................................................................................5

*Overhead Door Corp. v. The Chamberlaim Grp., Inc.*
   194 F.3d 1261 (Fed. Cir. 1999).................................................................................23

*Personalized Media Communications, LLC v. Int'l Trade Comm'n*
   161 F.3d 696 (Fed. Cir. 1998)..............................................................................14,27

*Quanta Computer v. LG Elecs., Inc*
   553 U.S. 617 (2008)...................................................................................................5

*Rexnord Corp. v. Laitram Corp.*
   274 F.3d 1336 (Fed. Cir. 2001).................................................................................42

*Soque Holdings (Bermuda) Ltd. V. Keyscan Inc.*
   No. C-09-2651-MHP, 2010 U.S. Dist. LEXIS 60501 (N.D. Cal. Jun 4, 2010)...............17, 28

*Superguide Corp. v. DirecTV Enterprises, Inc.*
   358 F.3d 870 (Fed. Cir. 2004).................................................................................4,5

*Texas Instruments Inc. v. United States Int'l Trade Comm'n*
    988 F.2d 1165 (Fed. Cir 1993)......................................................................2,6

*Toshiba Corp. v. Imation Corp.*
    681 F.3d 1358 (Fed. Cir. 2012).....................................................................40

*Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*
    520 U.S. 17 (1996)........................................................................................13

*Watts v. XL Sys., Inc.*
    232 F.3d 877 (Fed. Cir. 2000).......................................................................13

*Welker Bearing Co. v. PHD, Inc.*
    550 F.3d 1090 (Fed. Cir. 2008).....................................................................28

*WMS Gaming Inc. v. International Game Tech.*
    184 F.3d 1339 (Fed. Cir. 1999)..........................................................17, 19, 28

**Statutes**

35 U.S.C. § 112 ¶ 6 ................................................................................ *passim*

## I.        INTRODUCTION

As the parties' opening briefs made clear, Motorola is trying to have it both ways.  For the asserted Motorola patent, Motorola argues in the name of "plain meaning" for an interpretation so broad that it renders certain claim terms meaningless.  For example, in construing the disputed phrase "instruction message that corresponds to spoken instructions," Motorola attempts to equate "instruction message" with "spoken instructions" even after acknowledging that they are not the same.  Similarly, for the phrase "database including one of a parameter status and a mirrored database associated with the subscriber device," Motorola again argues that the plain meaning should apply, yet interprets the word "and" as if it were "or."  Finally, with respect to the disputed term "mirrored," Motorola advocates a proposed construction that fails to reflect the plain meaning of the word "mirrored."  For each of these, it is Apple—not Motorola—whose proffered definition is consistent with the plain meaning.

Conversely, for the asserted Apple patents, Motorola fights the plain meaning of the claim terms, instead urging the Court to (1) focus on ancillary issues that are not actually in dispute (*e.g.*, diverting the Court from the core dispute between the parties by focusing on the meaning of the word "completely" in the '760 Patent); (2) adopt narrower constructions by improperly importing limitations from preferred embodiments in the specification (*e.g.*, attempting to limit a "display object" in the '332 Patent to the "graphical representation of [a] system object" and add a "push" requirement into the meaning of the "speed reference" in the '050 Patent); (3) exclude preferred embodiments (*e.g.*, construing "speed reference" to exclude the disclosed query embodiments or "situational location" to exclude using information other than location in the '050 Patent); (4) violate the doctrine of claim differentiation (*e.g.*, requiring an "application object" in independent Claim 13 of the '332 Patent to "present information about the respective application" when that additional limitation is recited in dependent Claim 15); or (5) find means-plus-function language in the '332 and '760 Patents where § 112 ¶ 6 clearly does not apply.  For the reasons described below, the Court should reject Motorola's disregard of basic tenets of claim construction and adopt Apple's proposed constructions.

## II.    DISPUTED TERMS IN THE MOTOROLA '072 PATENT

### A.    An "Instruction Message That Corresponds To Spoken Instructions" Is Distinct From The Spoken Instructions Themselves.

| Apple's Proposed Construction | Motorola's Proposed Construction |
|---|---|
| instruction message that corresponds to spoken instructions:    data representing a spoken instruction | Plain meaning applies. |

Motorola's opening brief confirms that a dispute exists regarding the plain meaning of this phrase.  Accordingly, the Court should construe this phrase to clarify the distinction between an "instruction message that corresponds to spoken instructions" and the "spoken instructions" themselves.  Despite admitting that an "instruction message is not a 'spoken' instruction," *see* Motorola Br. at 58, Motorola nonetheless conflates the two terms in its descriptions of the '072 Patent.  Specifically, Motorola asserts that "[e]ach of the claims of the '072 Patent require an agent or server that…receives spoken instructions."  Motorola Br. at 53; *see also* Motorola Br. at 52 ("[w]hen a user gives spoken instructions, the device sends the spoken instructions to a server.").  That is not what the claims require.  Instead, the claims recite that the server "receiv[es] from the subscriber device, an instruction message that corresponds to spoken instructions."  Thus, it is clear that Motorola is attempting to read the phrase "instruction message" out of the claim.  That is not permitted.  *Texas Instruments Inc. v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir 1993) ("To construe the claims in the manner suggested [by the patentee] would read an express limitation out of the claims. This, we will not do because 'courts can neither broaden nor narrow claims to give the patentee something different than what he has set forth.'") (quoting *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 396, 155 U.S.P.Q. (BNA) 697, 701 (Ct. Cl. 1967)).

There is a "presum[ption]" that the use of different terms in the claims connotes different meanings."  *CAE Screenplates v. Heinrich Fielder Gmbh & Co. Kg*, 224 F.3d 1308, 1317 (Fed. Cir. 2000).  In this case, "spoken instructions" refers to actual speech from the user, whereas

"instruction message that corresponds to spoken instructions" refers to data representing that actual speech.  That is the "plain meaning," and the only logical construction of the claim in light of the intrinsic evidence and the understanding of a person of ordinary skill in the art.

Motorola's only response is to raise trivial objections to the use of the word "data" in Apple's construction.  Motorola first asserts that the use of the word "data" improperly narrows the scope of the claims.  But Motorola fails to explain what an "instruction message" could be if not data.  The '072 Patent is about transmitting information between a subscriber device and a server or remote agent via a network.  '072 Patent, Abstract ("method comprises receiving an instruction message (303) via a network that corresponds to spoken instructions from the subscriber device") (emphasis added); 2:4-11 ("In overview, the present disclosure concerns methods and apparatus for controlling and providing assistance…where these agents are available via a network to communications units") (emphasis added); 2:26-30 (describing the invention as "particularly applicable to systems and servers or agents that are networked via the Internet or world wide web and arranged and constructed for packet data communications including voice over IP (VoIP) with communications units") (emphasis added), *see also id.* at 3:47-52; 4:10-36.  Indeed, Figure 2 describes the signals received by the server as "packetized data from the network."  *Id.* at 4:25-27 (emphasis added).

Moreover, the specification confirms that "much of the inventive functionality and many of the inventive principles are best implemented with or in software programs or instructions and integrated circuits (ICs) such as application specific ICs."  '072 Patent at 3:13-16.  Motorola cannot dispute that software programs and integrated circuits process data, most commonly in the form of digital data.  And there can be no dispute that the word "data" is broad and covers any type of transmission between a subscriber device and the agent (*e.g.*, radio, packet data, etc.).  While Motorola also contends that the jury will be confused by the word "data," that argument is dubious in today's electronic world, wherein mobile phones are ubiquitous.[1]

---

[1]Should the Court deem it necessary, providing the jury a dictionary definition of "data" would alleviate Motorola's concerns.

While Motorola presents no meaningful objection to Apple's construction, it has demonstrated that if no construction is adopted by the Court, it will argue to the jury that the claims require receiving spoken instructions instead of an instruction message corresponding to spoken instructions.  Apple's construction, which differentiates between "spoken instructions" and "instruction message that corresponds to spoken instructions," should be adopted.

**B.     The Claims Recite "Database Including One Of A Parameter Status <u>And</u> A Mirrored Database Associated With The Subscriber Device," Not "Or."**

| Apple's Proposed Construction | Motorola's Proposed Construction |
|---|---|
| <u>database including one of a parameter status and a mirrored database associated with the subscriber device:</u>  collection of structured data including status information and a mirrored database [as construed] for each subscriber device | Plain meaning applies. |

Asserted Claim 4 requires a "database including <u>one of</u> a parameter status <u>and</u> a mirrored database…."  Apple submits that this means both a parameter status and a mirrored database are required, while Motorola contends that only one of the two is required.  The Federal Circuit entertained this exact dispute in *Superguide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870 (Fed. Cir. 2004) and rejected the very argument Motorola makes here.  In *Superguide*, the claim required "storing at least <u>one of</u> a desired program start time, a desired program end time, a desired program service, <u>and</u> a desired program type."  *Id*. at 884 (emphasis added).  Like Motorola in the present case, the patentee argued that the claim requires only "storage of one or more of the four listed."  *Id*. at 885.  The Federal Circuit disagreed and explained that "the patentee used the term 'and' to separate the categories of criteria, which connotes a conjunctive list" and concluded that the phrase "requir[es] that the user select at least one value for each category."  *Id*. at 886.  Accordingly, in Claim 4 of the '072 Patent, the use of "and" means that both a parameter status and a mirrored database are required.  In addition to this clear precedent, Apple also cited portions of the specification supporting the position that both a parameter status

and a mirrored database are required.  *See, e.g.*, '072 Patent at 6:18-21:  "the database associated with the communications unit, includes one or more of unit specific information, a parameter status, such as ringer type, and a mirrored database associated with the communications unit;" *see also id.* at 5:36-47; Fig. 3 at 311 ("database with unit specific information, parameter settings, mirrored database, including phone book").  In contrast, Motorola offers no intrinsic evidence to support its assertion that the presence of <u>either</u> but not <u>both</u> is sufficient.

Unlike the *Superguide* case, the *Ortho-McNeil* case cited by Motorola in a footnote is not on point.The claims of the patent in *Ortho-McNeil* case do not use the "one of a…and a…" claim language that is found in both the '072 Patent and the patent at issue in the *Superguide* case. *Ortho-McNeil Pharmaceutical, Inc. v. Mylan Laboratories, Inc.*, 520 F.3d 1358, 1361 (Fed. Cir. 2008).  Moreover, the Federal Circuit in *Ortho-McNeil* construed the word "and" to mean "or" because the dependent claims and the specification warranted such a construction.  *Id*. at 1362. Motorola offers no such evidence in support of its proposal that the Court here should rewrite the claim and substitute "or" for the claimed "and" in the '072 Patent.

Motorola also objects to Apple's rephrasing of "parameter status" as "status information."  There is no difference in scope between "parameter status" and "status information."  Apple's intention was to aid the jury because the term "parameter status" is not within the knowledge of an ordinary juror, nor does it have a common meaning.  Thus, absent a construction, it is unclear how the trier of fact would be able to ascertain whether a database qualifies as "parameter status."

Finally, Motorola contends that Apple's proposed construction is improper because it supposedly requires a database for each subscriber device.  Apple is not asserting that the claims require more than one subscriber device, and Apple's construction contains no such requirement. Nonetheless, to address any such concern, Apple would agree to modify its construction by substituting the word "each" with "the."

### C.   Both The Specification And Common Sense Confirm That A "Mirrored Database" Is Identical.

| Apple's Proposed Construction | Motorola's Proposed Construction |
|---|---|
| mirrored database:  collection of structured data that is identical to another collection of structure data | mirrored database:  collection of structured data that includes copies of items on a subscriber device |

The dispute regarding this term is whether, as Apple asserts, the mirrored database at the remote agent must be an identical copy of a database existing on the subscriber device, or whether, as Motorola asserts, the "mirrored" database at the remote agent need only merely include copies of some items on the subscriber device.  Motorola's proposal, which only requires that the server database contain copies of <u>some</u> items on the subscriber device, would cover a database at the remote agent that includes stored information that is different from the information stored on the subscriber device.  That is antithesis of the word "mirrored," which plainly means that the database at the subscriber device is identical to the database on the subscriber device (*i.e.*, mirror images are identical).[2]  Once again, Motorola is attempting to rewrite its claim, by deleting the word "mirrored."  As the Federal Circuit holds, "this we will not do."  *Texas Instruments*, 988 F.2d at 1171.

Motorola asserts that the word "identical" is not appropriate because there are "situations" when the database on the server may not be able to instantly replicate the data on the subscriber device, such as when subscriber device is "outside of an area of reception, or in airplane mode, or when a server is down."  Motorola Br. at 55.  First, these "situations" described by Motorola are not set forth in the '072 Patent, nor does the '072 Patent ever state that the mirrored database can (as a matter of design) contain data that is different from the data

---

[2]Apple's construction, which requires that the database on the server maintain an exact copy of the database on the subscriber device, is consistent with the usage of the term "mirrored database" in other patents.  *See*, *e.g.*, U.S. Pat. No. 6,279,038 at 8:50-52 ("For redundancy, certain databases are mirrored to provide a high degree of fault tolerance. To maintain integrity of all databases, changes to any of the master databases must be made to all affected slave databases as well."); U.S. Pat No. 6,381,325 at 3:25-27 ("database server 114, which maintains a pair of mirrored databases 116 to provide redundancy and ensure the integrity of the data.").

present on the corresponding database on the subscriber device.  More importantly, Apple is not advocating for a construction that would require the mirrored database to be statically identical, *i.e.*, not capable of updating or changing.  Rather, Apple's construction simply requires that the mirrored database on the server be an identical reflection of the database contained on the subscriber device.  Thus, to the extent the database on the subscriber device is modified, it would require a corresponding modification to the mirrored database on the server.  The fact that the modification of the mirrored database may take some short period of time (due to the realities of network connections) would not, under Apple's construction, mean that the database is no longer mirrored.  Motorola's attempt to stretch Apple's construction to an illogical extreme is irrelevant and not a basis on which the Court should reject Apple's construction.

Lastly, Motorola asserts that requiring the structure of the mirrored database to be identical to the structure of the corresponding database on the subscriber device is unsupported by the language of the claim.  Again, Motorola ignores the use of the term "mirrored" in the claim language.  "Mirrored" plainly conveys that the database on the server is identical in all respects to the database on the subscriber device.  While Motorola is correct that the "specification is silent on the format or structure of the data on the server," Apple's construction does not require any particular format or structure.  It simply requires that the format or structure of the mirrored database on the server be the same as the corresponding database on the subscriber device.

Motorola also takes issue with the Apple's phrasing because "another collection of data" could refer to a database from any source.  Motorola Br. at 55.  In the context of the '072 Patent, however, it is clear that the mirrored databases are those on the server and the subscriber device. Accordingly, Apple's construction, which takes into account and is consistent with the claim language that the patentees chose, should be adopted.

III.     DISPUTED TERMS IN THE APPLE PATENTS

    A.     The '332 Patent

        1.     "Application Object" Refers To A Graphical Element That Includes Information Associated With A Particular Application.

| Apple's Proposed Construction | Motorola's Proposed Construction |
|---|---|
| application object(s):   a graphical element that includes information associated with a particular application | application object(s):  graphical element that includes and presents information about a particular application |

The parties' dispute with respect to "application object" is narrow; indeed, it is limited to a single word.  The parties agree that an application object must "include" information about an application.  Motorola insists, however, that Claim 13's "application object" must also "present" that information, as dependent Claim 15 separately requires.  This is either redundant or in direct contravention of the doctrine of claim differentiation, and should be rejected in either case.

        a)   Motorola's "Presents" Limitation Is Redundant And Unnecessary.

As an initial matter, the arguments in Motorola's opening brief confirm that Motorola's "presents" limitation is redundant and unnecessary.  Motorola apparently intends its "presents" limitation to require that information about an application be visually displayed to the user within the graphic that makes up the "application object."  Motorola Br. at 28.  Apple agrees that, in view of the '332 Patent's specification, for information to be "included" within the application object, it must be visually included within the application object as that object is shown on the screen.  Thus, there is no reason to add Motorola's additional "presents" limitation; Apple's construction should be adopted.

        b)   If Motorola's "Presents" Limitation Is Not Redundant, It Improperly Violates The Doctrine Of Claim Differentiation And Imports A Limitation From The Specification Into The Claims.

If Motorola's "presents" limitation is intended to have a non-redundant meaning, it is wrong because it violates the doctrine of claim differentiation.  The "presents" limitation that Motorola would read into independent Claim 13 is already in Claim 15, which requires that

"each application object present[s] information about the respective application.  Importing this limitation from Claim 15 into Claim 13 violates the doctrine of claim differentiation and is presumptively incorrect.  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) ("[W]here the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest.").  Motorola presents no reason why that presumption should be overlooked here.

Moreover, Motorola's construction also impermissibly reads a limitation from individual embodiments in the specification into the claims.  "[A] claim construction must not import limitations from the specification into the claims."  *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed. Cir. 2012) (citing *Phillips*, 415 F.3d at 1323).  Motorola's brief relies on "the 'Summary' section of the specification [which] states that 'each application object present[s] information about the respective application." Motorola Br. at 27.  But this is not a description of <u>all</u> "application objects," but rather an optional feature, as is made clear by the first sentence in the paragraph that Motorola cites: "These and other embodiments can <u>optionally</u> include one or more of the following feature." '332 Patent at 1:44-45 (emphasis added).  Further, the paragraph that contains Motorola's other cited evidence is similarly limited to an optional feature: beginning "[i]n general, <u>one aspect</u> of the subject matter described in this specification <u>can be</u> embodied in systems that include. . ." and ending: "<u>Other embodiments of this aspect</u> include corresponding methods, apparatus, and computer program products." '332 Patent at 2:1-11 (emphasis added).  Motorola's attempt to read an optional feature of the invention into the claims is improper and should be rejected.

### c)  Apple's Proposed Construction Is Supported By Consistent Use Of The Term "Application Object" In The Specification.

Motorola's assertion that Apple's construction "cherry-picks" a portion of the specification is wrong: indeed, Apple's construction, unlike Motorola's, is fully consistent with all embodiments of "application objects" in the specification.  For instance, the specification states that "[e]ach application object **240** includes information associated with the particular

application" to describe the "application object" depicted in Figure 2.  '332 Patent at 7:3-4.

Elsewhere, the specification uses essentially the same language to describe the "application

objects" depicted in Figures 3, 11, and 12: "[e]ach application object **340** includes information

associated with the respective application;" "[e]ach application object **1140** includes information

associated with the particular application;" "[e]ach application object **1240** includes information

associated with the particular application."'332 Patent at 8:15-16; 15:7-8; 16:26-27.  Similarly,

when describing the "game objects" (which are a particular type of "application object"), the

specification states: "[e]ach game object **1040** includes information associated with the particular

game application."  *Id.* at 13:53-54.

Motorola's assertion that Apple's proposal allows that "information . . . could be

'included' only in a link accessible through a user's selection of the application object" is

incorrect.  *See* Motorola Br. at 28.  As discussed above, Apple agrees that information about an

application must be graphically included in—that is, displayed visually in—an application

object.  Motorola's hypothetical scenario is a straw man and should be disregarded.

### 2.  Display Object Need Not Be Construed Because Its Plain Meaning Will Be Understood By The Jury.

| Apple's Proposed Construction[3] | Motorola's Proposed Construction |
| --- | --- |
| No construction is necessary.<br><br>Alternatively:<br><u>display object</u>:  an object displayed on the screen | <u>display object</u>:  graphical representation of system object |

The term "display object" need not be construed because it will be understood by the

jury, or alternatively, it should be given its plain and ordinary meaning:  "an object displayed on

the screen."  The claims themselves support the plain and ordinary meaning; Claims 1 and 13,

---

[3]Contrary to Motorola's assertion, Apple never indicated that it would accept Motorola's construction.  Rather, Apple considered each iteration of Motorola's construction for "display object," but could not agree to any of them for the reasons set forth herein.

for instance, refer to "a first display object in a graphical user interface," confirming that a display object is part of a graphical user interface and, thus, must be displayed on a screen.

Motorola criticizes Apple's construction because "such an unrestrained definition could encompass virtually anything displayed on the screen." Motorola Br. at 24. However, Motorola's complaint has more to do with the breadth of the properly construed claim rather than whether Apple's construction is correct. "Display object" is used within the specification as a general term to describe an object displayed on the screen (in contrast with the more specific "application object"). The specification states that a "display object" can be "a system object," but it can also be "a short messaging service (SMS) object, a calendar object, a photos object, a camera object, a calculator object, a stocks object, a weather object, a maps object, a notes object, a clock object, an address book object, a settings object, [] an app store object," "the phone object **110**, the e-mail object **112**, the Web object **114**, [] the media player object **116**," and objects representing still other functions. '332 Patent at 3:65-67, 4:12-16, 36-45, 54-60.

Motorola, seeking to limit the scope of the claims, appears to associate the "icons" that appear on the home screen as coextensive with the term "display object." Motorola asserts that Apple seeks to cover "textual, not graphical, indications that a new application has been installed." Motorola Br. at 26. Yet, the '332 specification makes it clear that the term "display object" is broad. It encompasses objects that are not "icons" on the home screen, including ones that represent text. For example, a "display object" can represent "files," "alerts," or "events," which are all computer features that are frequently represented as text. '332 Patent at 3:65-4:2. Moreover, as the specification explains, a "display object" is not limited to a home screen icon. For instance, the display objects of the '332 Patent include not only the phone "icon" that appears on the home screen in, for example, Figure 1 (identified as object **110**), but also "display objects related to various phone functions" that are displayed "in response to a user touching the phone object **110**."[4] '332 Patent at 4:35-37.

_____

[4]Surprisingly, Motorola even cites this portion of the specification approvingly in its opening brief, yet now attempts to exclude it from its construction. *See* Motorola Br. at 25.

The '332 specification further discloses other "display objects" that are not "icons" that appear on the home screen, but rather are displayed on subsequent graphical user interfaces.  For example, "touching of the email object **112** may cause the graphical user interface to present display objects related to various e-mail functions."  '332 Patent at 4:38-40.  Also, "touching the Web object **114** may cause the graphical user interface to present display objects related to various Web-surfing functions."  *Id.* at 4:40-43.

Moreover, because Motorola provides no context as to the meaning of the term "system object" (either in its construction or its opening brief), adopting its construction would force the jury to interpret that term.  This would create, rather than eliminate, uncertainty and confusion as to the scope of the claim.  Although Motorola appears to believe that a "system object" is an icon, such a definition, even if correct—which it is not—would not be apparent to the jury.  As mentioned in Apple's opening brief, the jury may also confuse the term "system object" with operating system icons or system-preference functionality, for example, the file lists or sound, display, or printer settings windows and graphics found on Macintosh and Windows-based machines.  *See* Apple Br. at 26.  Because the term "display object" would be readily understood according to its plain and ordinary meaning—"an object displayed on the screen"—and Motorola provides no context for the term "system object," the Court should either decline to construe the term or alternatively construe it as "an object displayed on the screen."

### 3.  Means-Plus-Function Claiming Is Rare And Inapplicable Here.

Motorola also asserts that six claim limitations found in Claim 13 are drafted in means-plus-function form even though they do not use the words "mean" or "for."  Motorola is wrong: neither the law nor the policy behind § 112 ¶ 6 supports its position.  Means-plus-function claiming is meant to be shorthand in which the patent drafter claims a broad functional limitation without including any specific structure that can perform the claimed function in the claim itself.  *See, e.g., Apex Inc. v. Raritan Comp., Inc.*, 325 F.3d 1364 (Fed. Cir. 2003).  It generally takes the form of the non-descript word "means" plus a function that must be accomplished.  *Id.*  Indeed,

35 U.S.C. § 112 ¶ 6, which allows means-plus-function claiming, was not intended to have broad, sweeping applicability, but was enacted by Congress as "a targeted cure to a specific problem." *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 27-28 (1996) (explaining that § 112 ¶ 6 was a response to *Halliburton Oil Well Cementing Co.* v. *Walker*, 329 U.S. 1 (1946), in which patent claims reciting "conveniently functional language at the exact point of novelty" had been rejected).

When analyzing whether a claim limitation is subject to § 112, ¶ 6, "[t]he term 'means' is central to the analysis." *Apex*, 325 F.3d at 1372. "[A] claim term that does not use 'means' will trigger the rebuttable presumption that § 112, ¶ 6 does not apply." *Id.* Indeed, the absence of the word "means" is typically dispositive since the Federal Circuit has "seldom held that a limitation not using the term 'means' must be considered to be in means-plus-function form." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1362 (Fed. Cir. 2004) (holding that the "connector assembly" term at issue was not subject to § 112 ¶ 6, and vacating the district court's finding of non-infringement). Only "unusual [] circumstances [can] overcome the presumption that a limitation lacking the word 'means' is not in means-plus-function form." *Id*.

The Federal Circuit has stated that whether an "unusual circumstance" exists depends on whether the elements that would perform the supposed "functions" are understood as structure by a person of ordinary skill in the art. "[I]t is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function." *Lighting World*, 382 F.3d at 1359-60 (citing *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996); *Apex*, 325 F.3d at 1372; *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002); *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000); *Personalized Media Communications, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 704 (Fed. Cir. 1998). In other words, if the claim does not use the term "means" and a person of ordinary skill in the applicable art would understand the disclosed structure sufficiently to implement the claim, then the term cannot be subject to § 112 ¶ 6. No further analysis is necessary.

13

**a)  The Limitations Within Claim 13 Do Not Include The Term "Means" And Presumptively Are Not Subject To § 112 ¶ 6.**

The word "means" does not appear in any of the limitations that are the subject of Motorola's "unusual" request that the Court find Claim 13 of the '332 Patent subject to § 112 ¶ 6.  Indeed, it does not appear in Claim 13 at all.  "[A] claim term that does not use 'means' will trigger the rebuttable presumption that § 112, ¶ 6 does not apply."  *Apex,* 325 F.3d at 1372.  Thus, the absence of the term "means" from <u>any</u> limitation in Claim 13 creates the rebuttable presumption that § 112 ¶ 6 <u>does not apply</u>.  Motorola agrees, and did not argue otherwise in its opening brief.  Motorola Br. at 40-52.  Motorola must show that an "unusual circumstance" exists that would allow this presumption to be overcome.  *Apex*, 325 F.3d at 1372; *Lighting World*, 382 F.3d at 1362.  Motorola cannot meet this burden because Claim 13 provides sufficient structure to perform each of what Motorola asserts to be "functions."

**b)  Motorola Cannot Overcome The Presumption That § 112 ¶ 6 Does Not Apply Because A Person Of Ordinary Skill In The Art Understands That A "Mobile Device" Connotes Definite Structure.**

Motorola cannot overcome the presumption that the limitations in Claim 13 are not subject to § 112 ¶ 6 unless "it demonstrates that the claim term fails to recite sufficiently definite structure or else recites a function without reciting sufficient structure for performing that function."  *Apex Inc.*, 325 F.3d at 1372 (internal citations omitted).  In determining whether a claim recites sufficient structure, the Federal Circuit asks whether "the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function."  *Lighting World*, 382 F.3d at 1359-60.  In making this inquiry, the Federal Circuit generally relies on extrinsic evidence, such as dictionary definitions or expert testimony, to satisfy itself regarding the understanding a person of skill in the field would have had.  *Apex*, 325 F.3d at 1373 (relying on dictionary definition for "circuit" and finding that it is "clear" that the term "connotes some structure").  If the Federal Circuit's test is satisfied, sufficient structure exists, and the claim is not in means-plus-function form.  Thus, the issue here is whether a person

of skill in the relevant field would have understood "mobile device" to "designate structure," even if the term "covers a broad class of structures."[5] *Lighting World*, 382 F.3d at 1359-60.

In 2008, the term at issue—"mobile device"—was understood to generally designate a category or class of small, lightweight personal electronics, including mobile telephones as well as portable media players. This understanding is confirmed by expert testimony, usage in the field, and even Motorola's own use of the term. First, Apple asked Professor Joseph Konstan, an expert in the fields of computer science and user interfaces, whether the term "mobile device" was generally understood in 2008 to designate structure. Konstan Decl. at ¶ 1.[6] He confirmed that it was and that, in this context, the term referred to a class of physical devices such as those above. *Id.* at ¶ 8. Professor Konstan also explained that, in this context, the term "mobile device" referred, more generally, to a class of electronic devices capable of being easily carried, usually including wireless connectivity and an input mechanism such as a touchscreen. *Id.*

Second, other technology companies such as IBM and Cisco used the term "mobile device" to designate structure around the relevant time. *See, e.g.,* Ex. A[7], U.S. Pat. No. 8,432,275 (Cisco Tech. Inc.) (filed Jan. 10, 2008) ("The popularity of personal mobile electronic devices has increased dramatically in recent years. Such devices include but are not limited to cellular telephones, portable music players such as the Apple iPod™, and radios such as the Sony Walkman™. There have been news reports of people being hit by vehicles when crossing street while they were busy using their personal mobile devices."); Ex. B, U.S. Publ. No. 2009/0287777 (IBM Corp.) (filed May 15, 2008) ("Mobile devices, such as cellular telephones

---

[5] Motorola appears to deliberately remove the structure—"mobile device"—disclosed in Claim 13 from the disputed claim term and then point to only the words "device" and "processor" in an effort to confuse the issue before the Court and assert that sufficient structure is lacking. *See* Motorola Br. at 51 ("The limitations start with a generic 'device' and 'processor.'") But it is error to "rel[y] on [a] single word[] of [a] limitations, *e.g.*, 'circuit,' as opposed to the limitation[] as a whole." *Apex Inc. v. Raritan Comp., Inc.*, 325 F.3d 1364, 1372 (Fed. Cir. 2003). Rather, the law requires that the entire phrase "a <u>mobile device</u> with a processor and operable to perform operations including" be used as the basis for determining whether § 112, ¶ 6 applies. '332 Patent at Claim 13 (emphasis added).

[6] "Konstan Decl." refers to the Declaration of Joseph Konstan, filed concurrently with this brief.

[7] References to "Ex. ___" refer to the exhibits to the Declaration of Lawrence Lien.

are getting increasingly advanced.  Recently, so-called smartphones, such as the iPhone by Apple Computers and the BlackBerry by RIM have become increasingly popular.")

Third, Motorola *itself* apparently believed in 2008 that the term "mobile device" designates a definite structure.  *See, e.g.,* Ex. C-E, U.S. Pat. Nos. 8,364,120 (filed Aug. 2, 2006); 8,314,838 (filed Dec. 28, 2007); 8,478,231 (filed May 1, 2006).  For example, one Motorola patent from this timeframe claimed:

> 1. A method for verifying the identity of a user of a ***mobile device***, the method comprising:
>
> determining, by the ***mobile device***, the location of the mobile device over recent time to obtain a current route;
>
> comparing, by the ***mobile device***, a feature of the current route to characteristic features of previous routes

Ex. C, U.S. Pat. No. 8,364,120 at Claim 1 (emphasis added).  This patent used the term "mobile device" to define the structure that carries out the method that Motorola claimed.  And nowhere in its specification did Motorola set forth a further definition of "mobile device," confirming that even Motorola (outside the context of litigation) understood the term to have a generally understood connotation to people of ordinary skill in the art in 2008.

Once a term is determined to designate structure to a person of skill in the art, the Federal Circuit sometimes, as a check, looks to the specification to confirm that the term is not used in the patent in an inconsistent manner.  *Apex*, 325 F.3d at 1373-74.  Here, the '332 Patent's specification is consistent with the person of ordinary skill's structural understanding of "mobile device."  For example, the "Background" portion of the specification includes examples of "mobile devices," including specific tangible things such as "a mobile phone," "a personal digital assistant (PDA)," and "a media player."  '332 Patent at 1:15-20.  Further, the specification states that "[t]he mobile device **100** can be, for example, a handheld computer, a personal digital assistant, a cellular telephone, a network appliance, a camera, a smart phone, an enhanced general packet radio service (EGPRS) mobile phone, a network base station, a media player, a navigation device, an email device, a game console, or a combination of any two or more of

these data processing devices or other data processing devices." *Id.* at 3:29-36.  Indeed, the structural term here—"a mobile device"—is more specific than the term ("circuit") that was found to be structural in *Apex*, where the court stated, "it is clear that the term 'circuit,' by itself connotes some structure." *Apex*, 325 F.3d at 1373.  Moreover, the use of the term "mobile device" is not a mere verbal "nonce" or a substitute for the generic word "means."  The term "mobile device" places definite limits on the categories of devices that can perform the claims and excludes, for instance, desktop computers, touchscreen kiosks, standard high-definition televisions, automobile dashboards, and many others.  Thus, the claims recite sufficient structure—"a mobile device including a processor."  The Federal Circuit's inquiry would end here, as should this Court's, with a finding that Claim 13 is not subject to § 112 ¶ 6.

Moreover, the authority Motorola cites is not persuasive.  Motorola relies heavily on cases in which the Federal Circuit has found that "[i]n a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." *WMS Gaming Inc. v. International Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999) (emphasis added).

However, in *WMS Gaming* and its Federal Circuit prodigy cited by Motorola (*Aristocrat Techs, Finisar Corp.,* and *NetMoney*) the terms at issue contained the word "means."  Only *Soque Holdings,* an unpublished district court opinion, subjected a term that did not contain the words "means" to § 112 ¶ 6 treatment. 2010 U.S. Dist. LEXIS 60501 (N.D. Cal. June 4, 2010).  However, even in that decision, "means" played a role.  In construing that the claim term "computer displaying" was subject to § 112 ¶ 6, the court reasoned that "the language of claim 32 is identical to the language in claim 1, except that 'means for' has been replaced with 'computer.'" *Id.* at *38.  These cases have no bearing on the issue of whether a claim to a mobile device that does not use the term "means" should be subject to § 112 ¶ 6.  The Court should reject Motorola's invitation to create an "unusual" situation out of the mundane.  No claim limitation in Claim 13 is subject to § 112 ¶ 6.

**c)   Even If Claim 13 Were Subject To § 112 ¶ 6, The Specification Discloses Sufficient Structure.**

Under Federal Circuit precedent, the analysis should be over:  Claim 13 is not drafted in means-plus-function form, and there is no need to attempt to identify the "functions" and "structure" that would exist if it, hypothetically, were.  If the Court determines to engage in that analysis, however, Claim 13 is not indefinite. A means-plus-function claim covers the structure in the specification corresponding to the functions in the claims, and is not indefinite if such structure exists.  *Al-Site Corp. v. VSI International, Inc.,* 174 F.3d 1308 (Fed. Cir. 1999).

Here, Motorola never specified <u>any</u> alleged "functions" found in Claim 13, either in its claim construction positions or in its opening brief.  Identifying the function of an alleged means-plus-function term is a threshold issue in the analysis, however, because the legally relevant question is not whether some abstract level of structure exists in the patent, but whether structure <u>corresponding to</u> the alleged functions is present.  *Id.*  Motorola had the burden of identifying the proposed functions, both because it bears the burden of proof on the issue of invalidity, and because Claim 13 is presumptively not drafted in mean-plus-function form.

Despite this burden, Motorola failed to specify what it believed the "functions" in Claim 13 to be.  Its means-plus-function invalidity argument should be rejected on that basis alone.  In an attempt to respond to the general arguments in Motorola's opening brief, Apple has identified below what it believes the "functions" and corresponding structures would be if the Court finds Claim 13 to include means-plus-function limitations.  In that case, the Court should find that the patent is not invalid because of the disclosure of these structures, and hold that Motorola has waived any arguments regarding the proper function and structure by failing to present them in its brief.

Moreover, Motorola's suggestion that the corresponding structure must be an "algorithm" is wrong.  Structure corresponding to a "means" term need not be an algorithm.  *See, e.g., Al-Site*, 174 F.3d at 1308.  In fact, only when a general-purpose computer or microprocessor (or its equivalent) in a term subject to § 112 ¶ 6 is asserted to be the sole structure is an algorithm

required.  In such cases, an algorithm is needed to convert the "general-purpose" computer into the so-called "special-purpose" computer or microprocessor (or its equivalent).  *See WMS Gaming Inc.*, 184 F.3d at 1349.

Here, the claims are directed at the construction of a user interface for a mobile device, not at a software algorithm or particular way of programming.  And the '332 Patent discloses structure throughout its specification that is used to perform the acts recited on the claimed mobile device.  For instance, the specification discloses specific user interfaces that perform the acts recited in Claim 13's limitations.  This disclosure would be understood by a person of ordinary skill in the art as structure within the specification that is clearly linked and associated with the claim limitations recited in Claim 13.  Konstan Decl. at ¶¶ 10-19.

For instance, the specification clearly links and associates structure for the limitation "receiving a touch input to a first display object in a graphical user interface, the first display object being associated with an application management interface on a mobile device."  Figure 1 discloses an app store object (circled in red), as illustrated in the composited figure, consisting of Figures 1, 2, and 16 from the '332 Patent, below:



19

The specification clearly links the app store object with a display object, stating "the top-level graphical user interface can include additional display object **106**, such as . . . an app store object **132**." '332 Patent at 4:54-60.  The specification then links and associates invoking the app store object with an application management interface: "FIG. 2 is a block diagram **200** of an example user interface of the mobile device **100** after invoking an application store display object (e.g., app store display object **132** of FIG. 1).  For example, the user can access the app store display object **132** using the touch-sensitive display **102** (*e.g.*, by pressing the app store display object **132**), resulting in a transition to an application store interface." *Id.* at 6:8-14 (emphasis added).

The specification similarly clearly links and associates structure for the next limitation "presenting the application management interface in response to the received touch input, the application management interface including a plurality of menu items wherein each menu item is associated with different criteria for presenting application objects corresponding to respective applications available for installation."  As discussed above, the specification clearly shows that the application management interface of Figure 2 is presented in response to the received touch input on the app-store display object.  *See* '332 Patent at 4:54-64, 6:8-14.

The specification likewise clearly links and associates structure for the limitation "presenting one or more application objects within the application management interface according to the criteria for a particular menu item, the one or more application objects corresponding to respective applications available for installation on the mobile device."  Figure 2 discloses three application objects available for installation (shown in the figure above in the blue rectangle) according to a category for a menu item, here the "Recently Added" menu item (shown in the red rectangles in the figure above).  Figure 2 also discloses other criteria associated with other menu items, including "a featured tab **216**, a categories tab **218**, a top 25 tab **220**, a search tab **222**, and an updates tab **224**." *Id.* at 6:18-21.  In Figure 2, "[t]he recently added button **202** is shown as currently selected (e.g., based on a user input to the touch-sensitive display **102**)." *Id.* at 6:40-43.  Moreover, the specification clearly discloses that the application items are displayed according to the criteria of the particular menu item that is selected.  For

instance, "[w]hen the recently added button **202** is selected, the application objects **240** displayed correspond to applications that have been recently added to the application store." *Id.* at 6:42-45. Other figures within the specification show application objects within the application management interface according to different menu items.  For instance, Figure 3 "is a block diagram **300** of an example user interface of the mobile device **100** after selecting a staff favorites button (*e.g.*, staff favorites button **204** in FIG. 2)."  *Id.* at 7:51-53.

 The specification also clearly links and associates structure for the limitations "receiving one or more inputs within the application management interface including an input to install a particular selected application" and "installing the selected applications."  Specifically, the application objects in Figure 2 contain "purchasing information [that] indicates whether the application is free or must be purchased (*e.g.*, identified by "free" or "buy" labels)."  *Id.* at 7:23-26.  The specification explains that selecting an application by tapping on the purchasing information causes it to be downloaded and installed, "Fig. 16 is a block diagram **1600** of an example user interface of the mobile device **100** illustrating an application download . . . [w]hen the user selects an application object to download, the user interface can transition to the home screen including display objects **104** and **106** as described above with respect to Fig. 1."  *Id.* at 18:44-50.

 Finally, the specification clearly links and associates structure for the final limitation in claim 13 "presenting a second display object associated with the installed application."  For example, Fig. 1 discloses "display objects."   The specification clearly links and associates the display objects on the screen shown in Fig. 1 with an installed application, stating "[w]hen the user selects an application object to download, the user interface can transition to the home screen including display objects **104** and **106** as described above with respect to Fig. 1"  *Id.* at 18:47-50.  Elsewhere, the specification states that after installation of an application, "[t]he application is presented in a home screen of the mobile device (step **1714**)."  *Id.* at 19:37-39; *see also* Konstan Decl. at ¶¶ 10-19.

The structure that is clearly linked to the limitations of Claim 13 is summarized below. Even if any limitation in Claim 13 of the '332 Patent were found to be subject to § 112, ¶ 6, the Court should find that sufficient corresponding structure exists in the specification and that the claim is not invalid.

| Alleged "Means-Plus-Function" Limitation | Associated Structure |
|---|---|
| "operable to perform operations including: receiving a touch input to a first display object in a graphical user interface, the first display object being associated with an application management interface on a mobile device" | One or more of the following alternative structures set forth in Figs. 1, 2; cols. 4:30-45, 4:54-64, 6:8-16, 12:42-47, 18:64-19:2. |
| "operable to perform operations including: [. . .] presenting the application management interface in response to the received touch input, the application management interface including a plurality of menu items wherein each menu item is associated with different criteria for presenting application objects corresponding to respective applications available for installation" | One or more of the following alternative structures set forth in Figs. 2, 3, 6, 9-12, 14-15, 17; cols. 1:45-52, 2:1-10, 6:8-59, 7:51-8:4, 12:39-64, 12:65-13:14, 13:15-20, 14:29-44, 15:53-16:5, 17:15-30, 17:50-65, 18:64-19:10. |
| "operable to perform operations including: [. . .] presenting one or more application objects within the application management interface according to the criteria for a particular menu item, the one or more application objects corresponding to respective applications available for installation on the mobile device" | One or more of the following alternative structures set forth in Figs. 2, 3, 6, 9-12, 14-15, 17, cols. 1:45-60, 2:1-10, 6:8-59, 7:3-14, 7:51-8:4, 8:15-24, 12:39-59, 12:65-13:14, 13:15-20, 13:48-64, 14:29-37, 14:57-15:17, 15:53-62, 16:6-25, 17:15-30, 17:50-65, 18:10-21, 19:3-19:10. |
| "operable to perform operations including: [. . .] receiving one or more inputs within the application management interface including an input to install a particular selected application" | One or more of the following alternative structures set forth in Figs. 2-4, 6, 10-12, 14-15, 17, cols. 1:52-63, 9:39-52, 17:15-30, 19:11-25. |
| "operable to perform operations including: [. . .] installing the selected application" | One or more of the following alternative structures set forth in Fig. 17, cols. 1:61-63, 9:39-52, 19:26-36. |
| "operable to perform operations including: [. . .] presenting a second display object associated with the installed application" | One or more of the following alternative structures set forth in Figs. 1, 15, 17-18, cols. 4:30-45, 4:54-64, 19:37-46. |

> **d)  Even If Limitations Within Claim 13 Were Subject To § 112 ¶ 6 And An Algorithm Were Required, The Specification Discloses Sufficient Structure.**

Finally, in the unlikely event that the Court were to find both that Claim 13 is subject to § 112 ¶ 6 and that the required structure must include an algorithm, an algorithm exists within the specification.  A flowchart or flow diagram is sufficient to disclose an algorithm.  *See, e.g., Overhead Door Corp. v. The Chamberlaim Grp., Inc.,* 194 F.3d 1261 (Fed. Cir. 1999). "Fig. 17 is a flowchart illustrating an example process **1700** for navigating an application store using a mobile device." '332 Patent at 18:64-65.  Figure 17 of the '332 Patent sets forth the process of "navigating an application store using a mobile device.  An input is provided to a mobile device requesting an application management interface (step **1702**). For example, the user can select (*e.g.*, using a touch-sensitive display) an application store object as shown, *e.g.*, in FIG. 1." *Id.* at 18:64-19:2.  Next, "[a]n application management interface is presented (step **1704**). For example, one or more user interfaces can be presented in association with an application store." *Id.* at 19:3-5.  Next, "[a]n input is received selecting a particular application for installation (step **1706**). The input can be received, for example, from a user touching a touch-sensitive display (e.g., touch-sensitive display **102** of FIG. 1)." *Id.* at 19:11-14.  Once selected, the application is installed and presented in the home screen as shown in steps 1710 and 1714 and described in the specification at col. 19:26-46.

Further, the '332 specification is essentially a continuous, in-depth description of the "algorithm" used to perform the acts set forth in the claims.  The specification describes a series of illustrations of different states of a mobile device's user interface, and descriptions of the transitions between these states.  An example of this is shown in the composited figure above showing exemplary states and transitions including displaying the app-store display object, presenting the one or more application objects, through installing the application and displaying the associated display object.  The specification provides detailed descriptions of each of the mobile device states depicted in the figures and how and when to transition between them. '332 Patent at 18:44-50.

Each state and the transitions between states would have been understood in 2008 by a person of ordinary skill in the art as disclosing an algorithm of how the user interface should appear and operate.  Konstan Decl. at ¶¶ 20-21.  Moreover, once provided with the inventive disclosure of the '332 Patent, given the state of the art in programming at the time, a person of ordinary skill would have understood the mechanics of how to implement such an algorithm using, potentially, different application frameworks that existed at the time, such iOS or Android.  These frameworks contained graphics, animation, and application frameworks that allowed programmers to "reuse" blocks of code to implement standard features of applications, such as displaying graphics and text and responding to input.  *Id.* at ¶¶ 22-23.  Because the '332 Patent discloses multiple algorithms to accomplish the limitations within Claim 13, the Court should not find Claim 13 indefinite.

### B.   The '760 Patent

#### 1.   Motorola's Indefiniteness Allegations Should Be Rejected Because The Limitations Within Claims 10 and 11 Are Not Subject To 35 U.S.C. § 112 ¶ 6.

| Disputed Claim Language | Apple's Proposed Construction | Motorola's Proposed Construction |
|---|---|---|
| "instructions for . . ." | No construction is necessary.<br><br>This term is not subject to § 112 ¶ 6. | Indefinite under 35 U.S.C. § 112 ¶ 6 for failing to disclose structure in the specification corresponding to the claimed functions. |

As with the '332 Patent, Motorola asks the Court—through claim construction—to find that five different claim terms recited in every asserted independent claim (Claims 1 and 10) of the '760 Patent are means-plus-function limitations that lack sufficient disclosed structure.  However, Motorola's brief fails to address its § 112 arguments for asserted Claims 1, 3, 4, 5, and 7.  *See* Motorola Br. at 44-50 (concluding only that "claims 10 and 11 of the '760 Patent are

indefinite under 35 U.S.C. § 112").[8]  Motorola has therefore waived any arguments with respect to the other asserted claims or at a minimum has failed to overcome the presumption that these claims are not subject to § 112 ¶ 6.  Additionally, Motorola did not analyze each limitation in Claims 10 and 11, instead choosing to rely on the broad allegation that the mere use of the phrase "instructions for" renders five different claim limitations invalid without identifying the alleged functions or specific deficiencies in the corresponding structures.  This is inadequate to overcome the strong presumption that absent "means for" language in the limitation, § 112 ¶ 6 does not apply and the even stronger presumption that the claims are valid.  In any event, the disclosure of pertinent structure in the claims and specification provides a separate and independent reason for the validity of the claims.  Even if claim construction were the proper procedure for invalidating claims under § 112 ¶ 2, (which it is not, s*ee Forest Labs. Inc. v. Cobalt Labs. Inc.,* Case No. 08-cv-21-GMS-LPS, 2009 WL 3010837, at *1 n.3 (D. Del. Sept. 21, 2009)) and even if the claims were not *Beauregard* claims (which they are, *see* Apple Br. at 13-17 and *infra*), § 112 ¶ 6 would not apply.

### a)  "Instructions For" Is Not Equivalent To "Means For."

Claim 10 is a *Beauregard* claim.  A *Beauregard* claim is characterized by claiming a computer-readable medium and instructions that cause a computer to perform a process.  *See In re Beauregard*, 53 F.3d 1583 (Fed. Cir. 1995).  In patent drafting, *Beauregard* claims are distinct from means-plus-function claims.  Nevertheless, according to Motorola, the use of "instructions for" language triggers means-plus-function treatment.  Motorola Br. at 44.  Motorola ignores that the phrase "instructions for" is standard claiming language for *Beauregard* claims like Claim 10 and fails to show why this should be treated like means-plus-function language.

---

[8]Even if Motorola argues that it has not dropped and waived its arguments with respect to claims other than 10 and 11, the "means-plus-function" arguments presented by Motorola for device Claims 10 and 11 in its opening brief are inapplicable to method Claims 1, 3, 4, 5, and 7.

**b) Courts Have Found Similar Claims Using "Instructions For" Language Not Subject To § 112 ¶ 6.**

Tellingly, Motorola fails to provide <u>any</u> analysis of "instructions for" claim language similar to the limitations at issue here.  Indeed, the one case Motorola cited where a claim used "instructions for" language was a related *Apple v. Motorola* case in Illinois in which Motorola did not allege that the similar "instructions for" language should be subject to § 112 ¶ 6.[9]  In directing this Court to other language in an Apple patent construed by Judge Posner in that case, Motorola fails to mention that the "instructions for" *Beauregard* language within the same claim was not even asserted by Motorola to be means-plus-function language.  *See Apple Inc. and NeXT Software Inc. v. Motorola, Inc. and Motorola Mobility, Inc.*, 2012 U.S. Dist. LEXIS 67384 at *40 ("<u>instructions for</u> detecting one or more finger contact with the touch screen display; <u>instructions for</u> applying one or more heuristics to the one or more finger contact to determine a command for the device; and <u>instructions for</u> processing the command…") (emphasis added).

Moreover, at least one Court has explicitly found that *Beauregard* claims were <u>not</u> subject to § 112 ¶ 6.  In *Certain Portable Electronic Devices and Related Software*, Inv. No. 337-TA-797, Order No. 57, 2012 ITC LEXIS 1835 (ITC June 26, 2012) the International Trade Commission considered Claim 19 of Apple's U.S. Patent No. 7,469,381 which included a number of "instructions for" limitations, such as:

- "<u>instructions for</u> displaying a first portion of an electronic document"
- "<u>instructions for</u> detecting a movement of an object on or near the touch screen display"
- "<u>instructions for</u> translating the electronic document displayed on the touch screen display in a first direction to display a second portion of the electronic document, wherein the second portion is different from the first portion, in response to detecting the movement"
- "<u>instructions for</u> displaying an area beyond an edge of the electronic document and displaying a third portion of the electronic document, wherein the third portion is smaller than the first portion, in response to the edge of the electronic

---

[9]This was not a unique incident; Samsung also did not argue that these limitations were means-plus-function when Apple asserted that patent against it in the ITC even though Samsung was represented by the same counsel.  *In the Matter of Certain Electronic Digital Media Devices and Components Thereof*, Inv. No. 337-TA-796, Order No. 16 at *9-16 (ITC Mar. 6, 2012).

document being reached while translating the electronic document in the first direction while the object is still detected on or near the touch screen display"

- "<u>instructions for</u> translating the electronic document in a second direction until the area beyond the edge of the electronic document is no longer displayed to display a fourth portion is different from the first portion, in response to detecting that the object is no longer on or near the touch screen display"

*Id.* at *47-49.  There, after analyzing claims reciting similar hardware (*e.g.*, touch screen display, processors, memory, and programs executed by those processors), the ALJ found sufficient structure for executing the software programs and/or instruction to perform the functions and concluded that the strong presumption against construing "instructions for" under § 112 ¶ 6 was not overcome.  *Id.* at *78, 81-83.

The '760 Patent contains similar *Beauregard* claim limitations and structure to the Apple patents in the related *Apple v. Motorola* case and *Certain Portable Electronic Devices* cases and should also be found not to be subject to § 112 ¶ 6 for the same reasons.  Therefore, because Motorola has not shown that the disputed "instructions for" is anything other than the standard language of *Beauregard* claims, the Court's analysis can stop here because Motorola has not overcome the presumption that they are not subject to § 112 ¶ 6.

### c)  Motorola Cannot Overcome The Strong Presumption That The Limitations Are Not Subject To § 112 ¶ 6.

Even if the claims were not written in *Beauregard* format, Motorola has another hurdle it must overcome.  Motorola must overcome the strong presumption that § 112 ¶ 6 does not apply in the absence of "means for" language.  *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed.Cir.2004) ("the presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome."); *Personalized Media Communications,* 161 F.3d at 703-704.  This Motorola cannot do, because the claims themselves recite structure, including the algorithm to be performed and the hardware preforming that algorithm, a portable electronic device with a processor.

Indeed, Motorola does not try, failing to provide any serious analysis or to explain why the recited instructions are functional, a necessary prerequisite to applying § 112 ¶ 6 to

limitations lacking "means for" language. Instead, Motorola summarily states that "[t]hese are purely functional claims masquerading as structural ones" and that "[n]owhere in the claim is there definite structure for performing any of the claimed functions…" Motorola Br. at 45-46. However, the claim limitations recite specific structure (*e.g.*, hardware, processor, computer programs, touch screen display) and are limited to a specific manner of displaying, initiating a phone call, substituting a display, and initiating a communication set forth in the claim limitations themselves. Specifically, the limitations spell out the when, what, and how these actions are to be performed to create the relevant user interfaces on the touch screen display of the portable device in Claim 10. The description in the specification of the claimed device having a set of instructions for performing functions does not mean that the descriptions of those instructions in the claims is "functional" under § 112 ¶ 6. *See* Motorola Br. at 47 (citing '760 Patent at 2:22-38). To the contrary, the section of the specification cited by Motorola identifies the structure in the claim. Motorola's attempt to link the words "function" and "functional" by mere semantics should be rejected.

The cases Motorola cites are not on point. As noted above with respect to the claims terms in the '332 patent, *WMS Gaming, Aristocrat Techs, Finisar Corp., NetMoney*, and *Soque Holdings* used the term "means" (or a claim that was nearly identical to a claim using "means"). In contrast, the word "means" is never used in Claims 10 or 11, nor has Apple agreed that the limitations are subject to § 112 ¶ 6. Therefore these cases are not helpful in determining whether the strong presumption against applying § 112 ¶ 6 is appropriate.

The cases that Motorola cites where the presumption was overcome are also distinguishable. In *Mass. Inst. Of Tech. v. Abacus*, 462 F.3d 1344 (Fed. Cir. 2006); *Aspex Eyewear, Inc. v. Contour Optik, Inc.*, 288 F. App'x 697 (Fed. Cir. 2008); and *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090 (Fed. Cir. 2008), the terms at issue were hardware elements "mechanism," "element," or "device" and the analysis in those cases does not aid in determining whether the disputed *Beauregard* claim limitations here are purely functional. *M.I.T.* 462 F.3d at 1353; *Aspex*, 288 F. App'x at 703-704; *Welker,* 550 F.3d at 1095-97. Also, the holdings

regarding the "heuristics" limitations in the aforementioned *Apple v. Motorola* Illinois case are not instructive; indeed, Motorola did not even argue (and the Court did not hold) that the "instructions for" limitations from those claims were subject to § 112 ¶ 6.  Therefore, this Court should similarly find that the disputed limitations are not subject to § 112 ¶ 6.

### d)  Even Assuming, *Arguendo*, The "Instructions For" Terms Are Subject To § 112 ¶ 6, Adequate Corresponding Structure Is Disclosed.

Finally, even if the limitations in Claims 10 and 11 are means-plus-function claims, Motorola's indefiniteness argument still fails because even under a traditional means-plus-function analysis, the specification of the '760 Patent discloses sufficient corresponding structure to support the claim limitations.  Specifically, the text and the figures describe a step-by-step algorithm which may be implemented by the disclosed hardware linked to the claims:

- Displaying a list of interactive items with first and second interactive portions, including the type of information that can be displayed, the features and characteristics of what can be displayed, and the interactive aspects of the display.  *See, e.g.*, '760 Patent at 7:38-7:5, 24:32-25:3, 30:41-31:8. 31:49-32:27,32:66-33:35, 33:53-34:51, Figs. 1-2, 12A, 12B, 23-27.

- Initiating a return telephone call in response to detecting a finger gesture on the first interactive displayed portion. *See, e.g.*, '760 Patent at 7:38-17:5, 24:32-25:3, 25:51-57, 30:41-31:8. 31:49-32:27,32:66-33:35, 33:53-34:51, 35:51-36:4, Figs. 1-2, 12A, 12B, 14A-14D, 23-27.

- Completely substituting display of the list of interactive items with display of contact information, including a plurality of contact objects) for a caller associated with a selected item in response to detecting a finger gesture on the second interactive displayed portion.  *See, e.g.*, '760 Patent at 7:38-17:5, 24:32-25:30, 30:41-33:64, 34:48-34:59, Figs. 1-2, 12A, 12B, 12C, 23-27.

- Initiating a communication with the selected caller via non-telephonic communication corresponding to the second contact object in response to detecting user selection of the second contact object.  *See, e.g.*, '760 Patent at 7:38-17:5, 31:23-32:27, 32:24-33:35, 33:33-33:51, 34:60-35:25, Figs. 1-2, 9, 12A, 12B, 18A, 23-27.

- Hardware and programs with instructions for generating the user interfaces, responding to user input, initiating a return phone call, and initiating non-telephonic communications as described above.  *See, e.g.*, '760 Patent at 7:38-17:5, Figs. 1-2.

The specification describes the hardware, software, and process for managing missed calls and the display of contact information associated with a missed call.  In terms of structure for a means-plus-function claim, that is all that is required.  *See Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008).

The disclosure in the '760 Patent is not like the results only, black box disclosures in *Aristrocat Technolgies Austrial Pty Ltd. V. International Game Technology*, 521 F.3d 1328 (Fed. Cir. 2008)(en banc) and *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371 (Fed. Cir. 2009) in that it claims with particularity displaying a list of interactive items, initiating a return telephone call, completely substituting a display, or initiating communication.  As discussed above, the '760 Patent further discloses the algorithms for these various actions and hardware to implement those algorithms, which distinguishes the claim limitations here from cases cited by Motorola like *Aristrocat* and *In re Katz Interactive Call Processing Patent*, 639 F. 3d 1303 (Fed. Cir. 2011) where no such algorithm existed.

   **2.    Motorola Mischaracterizes The Parties' Dispute Concerning "Completely Substituting Display Of The List Of Interactive Items With Display of Contact Information."**

| **Apple's Proposed Construction** | **Motorola's Proposed Construction** |
| --- | --- |
| Plain meaning applies.<br><br>Alternatively:<br>completely substitut[e/ing] display of the list [of interactive items] with display of contact information:  displaying at least two contact objects in place of the display of the list of interactive items | completely substitut[e/ing] display of the list [of interactive items] with display of contact information:  entirely replac[e/ing] the display of the list of interactive items with the display of information for a selected contact |
| [Previous proposal:  replacing the display of the list of interactive items with the display of information for a selected contact] | [Previous proposal:  entirely replac[e/ing] the display of interactive items from a missed call list with the contact list entry] |

   As Apple stated in its opening brief, it is easy for a jury to understand the plain and ordinary meaning of this phrase; claim construction is therefore unnecessary.  *See* Apple Br. at 10.  This straightforward, non-technical language means what it says:  in response to detecting a finger gesture on the second interactive portion, the display of the list of interactive items is completely substituted (replaced) with display of contact information for a respective caller. Despite reciting the claim limitations almost verbatim in its construction and agreeing that the

Court should adopt the "ordinary, non-technical meaning" of the term "completely", Motorola asserts that this term still needs to be construed. *See* Motorola Br. at 32. Apple agrees that the ordinary non-technical meaning of "completely" would be understood by a jury as synonymous with "entirely" (*i.e.*, replaced). But that is not the real dispute. If it were, this phrase would not need construction since Motorola concedes that the plain meaning of "completely" applies.

The real dispute between the parties was more apparent from Motorola's earlier proposed construction: "entirely replac[e/ing] the display of interactive items from a missed call list with *the contact list entry*." By dropping its earlier construction, however, Motorola shifted the debate away from the parties' core dispute. But because Motorola has not disclaimed its underlying non-infringement arguments, Apple respectfully requests the Court to construe this term and proffers the construction of this phrase from the Samsung case, which will allow the Court to address the actual point of disagreement.[10]

### a)  The Parties <u>Agree</u> The Plain Meaning Of "Completely" Applies.

Motorola's position regarding Judge Koh's recent construction of the term in question confirms that the parties' actual dispute relates to what must be substituted rather than whether the substitution needs to be complete. After Judge Koh issued her order construing the term in question in the litigation between Apple and Samsung addressing other Android-based devices, Apple offered to adopt that construction. *See Apple Inc. v. Samsung Electronics Co., Ltd.*, Case No. 12-cv-630, 2013 WL 1502181 at *22 (N.D. Cal. April 10, 2013) ("Koh CC Order," copy at Kaplan Ex. 7, D.E. 207-8). Motorola refused. Instead, it counterproposed the same construction that was suggested by Samsung and rejected by Judge Koh.[11] Motorola adopted Samsung's

---

[10]During the tutorial in the Samsung case, Judge Koh requested that the parties clarify their dispute over this phrase. At the claim construction hearing, the parties proposed new constructions. Apple's revised construction, which is Apple's alternative construction here, was ultimately adopted by Judge Koh.

[11]Motorola makes much of the timing of Apple's new construction for this term, complaining that Apple waited months after the issuance of Judge Koh's order to adopt her construction for this term. However, Judge Koh's claim construction order did not issue until after the parties proposed their original constructions and while they were attempting to narrow the case.

rejected construction even though it now argues that the parties' competing constructions in that case were meant to resolve a dispute that does not exist in this case.  Motorola Br. at 36-37.

Motorola cannot have it both ways.  Unless Motorola is conceding that it does not intend to pursue the same non-infringement arguments made by Samsung, Motorola's assertion that Judge Koh's construction addressed "entirely different" issues is disingenuous.  Otherwise, Motorola should not oppose this Court's adoption of Judge Koh's construction.

As noted by Apple, *see* Apple Br. at 10, Judge Koh's use of "displaying … in place of" in her construction of this phrase has essentially the same meaning as the "entirely replacing" portion of Motorola's proposed construction.[12]  Indeed, in the Samsung case when weighing the same claim constructions, Judge Koh made clear that she understood the parties to agree that "completely substituting" means "that, visually, the second display must take the place of the first display rather than being superimposed or concealing some portion of it."  Koh CC Order at *19.  Motorola claims that the parties' dispute concerning this phrase centers around whether "completely" should be given its plain and ordinary meaning.  Motorola Br. at 31.  If the Court accepts Motorola's argument at face value, no construction of this phrase is necessary because the plain meaning of "completely" applies and a jury would have no problem understanding it.

The truth is "completely" has never been the real term in dispute.  Motorola's originally proposed construction—"entirely replac[e/ing] the display of interactive items from a missed call list with the contact list entry"—attempted to read numerous unwarranted limitations into this phrase.  Motorola's earlier proposal appeared to (1) limit the "list of interactive items" to a list of missed calls rather than a list including missed calls; and (2) require that "the contact list entry" be displayed (*i.e.*, <u>all</u> contact information in an address book for a selected contact), as Samsung had argued before Judge Koh.  Koh CC Order at *19 ("Samsung, on the other hand, contends that the second display of 'contact information' must contain information beyond just replicating

---

[12]When asked during meet and confer what the word "entirely" added to Apple's previous alternative construction, Motorola did not articulate a distinction.  If Motorola is giving meaning to the term "entirely" that is beyond replacing the display of the list of interactive items, Apple reserves the right to dispute the scope of this term.

a portion of the original missed call list; specifically, <u>the second display contains a 'contact list entry' in addition to the plurality of contact objects.</u>") (emphasis added).  Unless Motorola is willing to concede that the '760 claims are not so limited to require a "contact list entry," focusing solely on the word "completely" would not clarify these issues for the jury.

### b) Any Attempt By Motorola To Further Narrow The Meaning Of "Completely" Should Be Rejected.

Moreover, Motorola's analysis of the "completely substituting" phrase appears to inappropriately narrow the inventions of the '760 Patent to the examples depicted in Figures 12B and 12C.[13]  Despite agreeing that the plain meaning of "completely" should apply, Motorola overstates the significance of the file history.  First, Motorola misstates the examiner's amendment as allegedly distinguishing over "close" prior art, when the examiner merely stated in his reasons for allowance that the identified references were the "closest" prior art.  *See* '760 Patent File History, June 1, 2011 Notice of Allowability at 15 ("Notice of Allowance," copy at Kaplan Ex. 9, D.E. 207-10).  Of this prior art, the Kun reference was cited as prior art in a pending rejection relevant to this limitation and the Chew reference was identified for the first time in the Notice of Allowance.  *Id.*  When looking at these two references, it is clear that the examiner was attempting to distinguish prior art that merely superimposed sub-menus over a small portion of the display, as shown below.



FIG. 5

FIG. 5c

---

[13]To the extent that Motorola's proposed construction implicitly limits "the list of interactive items" to a list of only missed calls, *see* Motorola Br. at 32-24, that interpretation should also be rejected.  Nothing in the claim language at issue supports this interpretation. Indeed, Figure 12A proves that the claims are not so limited because "the list of interactive items" in that embodiment is comprised of both missed and answered calls.  *See* '760 Patent at Fig. 12A.

*See* U.S. Patent No. 6,593,949 ("Chew") at Fig. 5 (left); U.S. Patent Publication No. 2006/0281449 ("Kun") at Figs. 5c (right); Feb 14, 2011 Response to Office action at 25 (In arguing that the phrase "replacing display of the list of interative items with display of the contact information" addressed the examiner's concerns over Kun in combination with Haitani, the applicant stated that this combinaiton was overcome beause "Kun discloses displaying the additional contact information in a sub-menu over the missed calls list (see Kun Figure 5C. Display of the sub-menu in Kun does not replace display of the missed call menu.").

Also, while the examiner states that the prior art did not disclose, *inter alia*, "completely substituting the display of the list of interactive items with display of contact information for a respective caller corresponding to the respective user selected items, as defined in the specification (Figs 12B-12C)," there is no indication that the identification of figures in a paranthetical was meant to limit the display to those exemplary embodiments.  Nor is there any indication that the examiner intended to limit manner in which the display of interactive items is replaced. [14]  Indeed, Judge Koh explicitly rejected the notion that the examiner's statement "expressly limits the claims to the contact list embodiment described by Figure 12" or that the examiner "intended to limit the content of the displays to the content shown in Figures 12B and 12C."  Koh CC Order at *22.

### c) Apple's Alternative Proposed Construction Addresses The Real Dispute Between The Parties Regarding "Contact Information."

As noted above, to the extent a dispute does exist, it likely revolves around Motorola's hidden intention to improperly narrow interpretation of "contact information" in this phrase.  As shown below, the claim language states that "contact information" is displayed in place of the "list of interactive items."  The claims define "contact information" as including "a plurality" (*i.e.*, one or more) "of contact objects."  *See* '760 Patent at Claim 1 ("the displayed contact

---

[14]Motorola states that its proposed construction requires the display of a new screen in which the missed call list has entirely replaced (rather than replaced by) the display of contact information. Motorola Br. at 34.  It is assumed, however, that this was a typographical error.

information including a plurality of contact objects").  Nowhere does the claim state that <u>all</u> information for a selected contact must be displayed.

Motorola's originally proposed construction required the display of "the contact entry." Under this misguided interpretation, the "list of interactive items" must be entirely replaced with "the display of all information for a selected contact," ostensibly to set up a non-infringement argument that if only one piece of information for a contact is not displayed, then there can be no infringement.[15]  Yet, that is not what the patent discloses or claims.  To the contrary, the claim recognizes that there can be multiple types of contact information for a given caller:  telephone numbers, email addresses, physical addresses, pager numbers, and fax numbers.  '760 Patent, 22:22-23:34, Figures 10D-10H.  Claim 1 only requires that two contact objects be displayed:  (1) "a first contact object comprising a telephone number object having the return telephone number," and (2) "a second contact object associated with a non-telephonic communication modality for contacting the respective caller."  This is embraced by Apple's construction (adopted by Judge Koh), which uses the language "displaying at least two contact objects" and is the construction most in line with the intrinsic record.

### 3.    The Specification And Claims Use "Contact Object" To Refer To An Object Associated With Contact Information.

| Apple's Proposed Construction | Motorola's Proposed Construction |
|---|---|
| Plain meaning applies.<br><br>Alternatively:<br><u>contact object</u>:  user selectable object that is associated with contact information for the selected contact | <u>contact object</u>:  a user selectable object containing contact information |

---

[15]This was the precise issue decided by Judge Koh's order:  whether the "contact information" required the display of the <u>contact entry</u> associated with the selected caller.  *See* Koh CC Order at *19.  Judge Koh's rulings concerning the required and permissible content of the display of contact information are equally relevant to these proceedings, not "entirely different" as Motorola contends.  Motorola Br. at 36.

Once again, the meaning of the term "contact object" is clear from the context of the claims, so it does not need construction. Motorola's construction is ambiguous and can lead to confusion since Motorola attempts to improperly import limitations from exemplary embodiments in the specification and then further equate "containing" with "displaying." If the Court finds that a construction of the term "contact object" is necessary, Apple's alternative construction is the only one consistent with the intrinsic record and does not improperly read limitations from embodiments into the term.

Motorola argues that "[t]he '760 specification repeatedly and exclusively refers to a 'contact object' as a user selectable object <u>containing</u> contact information." Motorola Br. at 38 (emphasis in original). Motorola then goes on to decry Apple's construction by stating:

> It is not clear what a user selectable object 'associated' with contact information means, and Apple has provided no examples from the specification of a contact object that is merely associated with (but does not contain) contact information. . . for instance, <u>Apple alleges that a contact object for initiating a text message need not set forth the phone number for the message.</u>

*Id.* at 40 (emphasis added). If by "set forth," Motorola means "displayed," this is absolutely correct—and exactly how the term "contact object" is used in the asserted claims. For example, Claim 1 does not require that the second contact object <u>contains</u> (or displays) a number or address, but merely requires that it is <u>associated with</u> a non-telephonic communication modality. *See* '760 Patent at Claim 1 ("a second contact object associated with a non-telephonic communication modality for contacting the respective caller"). The only mention of an object in relation to a telephone number is the "telephonic contact object." Further, Claim 14 has no requirement that a contact object have any contact information, just that the contact objects are associated with contact information. Motorola's construction completely ignores the fact that when a specific type of information is required, it is expressly recited in the claims.

Tellingly, none of Motorola's alleged support for its argument that a "contact object" must contain contact information actually describes the "contact object" itself or even uses the word "containing." Instead, Motorola's attempt at proof is directed to a "telephone number

object" having one type of telephone number. Motorola Br. at 38-39. The fact that a "telephone number object" has a telephone number does not mean that the term "contact object" have contact information as these are different objects.

Motorola also fails to explain why an object "containing" contact information must necessarily display that information. Motorola asserts that the specification repeatedly and exclusively refers to "contact objects" as user-selectable objects that contain contact information. Motorola Br. at 38. However, the figures and text Motorola identifies repeatedly are prefaced with the non-limiting language: "In some embodiments..." '760 Patent at 25:8-24 and Fig. 12C. Motorola also ignores evidence to the contrary. The description of the "instant message object," a particular type of "contact object," is not referred to as having or "containing" anything. *Id.* at 25:8-24 and Fig. 12C. Instead, consistent with Apple's proposed alternative construction, the specification explains that contact information for the selected contact is associated with the "instant message object" (*i.e.*, it uses the corresponding number of the missed call in order to prepare a text message when that object is selected). *Id.* Despite Motorola's protest, there is no confusion about what Apple's construction means.

Motorola's proposed construction of "contact object" is undoubtedly litigation-driven and has no basis in the intrinsic record. Motorola intends to argue that "contact objects" must not only "contain" but also display to the user particular contact information. This is because Motorola wishes to assert that objects such as icons, which are associated with but do not display contact information, do not infringe the '760 Patent. However, "contact object" is not so limited; instead, the patent explicitly contemplates a broader set of implementations, including icons. For example, the '760 specification discloses that user-interface objects (*e.g.*, "contact objects") can be "one or more soft keys, icons, web pages or images" displayed on the touch screen and that icons can be "user-interface objects including soft keys." *Id.* at 10:41-51; 13:27-31. The expressly contemplated use of an icon is additional support that "contact objects" should not be burdened with a requirement that "contact objects" also must display contact information.

Because Motorola's proposed construction ignores the claims and specification and rewrites the language of the claims, it should be rejected.

**C.      The '050 Patent**

**1.  The Term "Speed Reference" Means, As The Claims Explicitly State, A "Phone Number."**

| Apple's Proposed Construction | Motorola's Proposed Construction |
|---|---|
| speed reference:  a phone number<br><br>The remainder of this phrase, *e.g.,* the term "invocable," does not require construction. | invocable speed reference:  reference that is pushed to the data processing system |

Despite the significant differences in wording between the constructions, the parties' dispute with respect to the term "speed reference" is straightforward:  should a limitation from the '050 Patent's specification relating to how content may be "pushed" or "automatically delivered" to a user be read into the definition of the separate term "speed reference?"  The intrinsic record answers this question with a resounding no.  Motorola's "push" requirement, which it alternatively refers to as "automatic" or "proactive" delivery, and its arguments in its opening brief, violate almost every tenet of claim construction.  Motorola would read limitations from the specification into the claims, exclude the preferred embodiment, introduce a new and apparently technical term for the jury to decipher without any context, and require different constructions from the same term in claims of patents in the same family that share the same specification.  Apple's construction causes none of these issues, is taken literally from the definition provided in the words of the claim itself, and should be adopted.

**a)  Apple's Construction Is Drawn From the Claims, Whereas Motorola's Construction is Untethered to the Claim Language.**

Motorola's opening brief does not dispute that Apple's construction is taken word-for-word from the definition of "speed reference" found in the claims.  Instead, Motorola argues, in essence, that Apple's construction is wrong because it is ***too*** consistent with the claims.  According to Motorola, "the claims already set forth that the [] term invocable speed reference is

limited to a phone number" and Apple "simply restates words already used in the claim."
Motorola Br. at 16, 17.  As a matter of law, however, these are reasons why Apple's construction
is <u>right</u>, not wrong.  It is settled that where the patentee coins a term to define his invention, he
may provide a definition of that term in the claims, and if he does so, that definition governs.
For instance, in *Honeywell,* the patentee coined the term "first alert envelope" and provided a
specific definition in the claims of what the alert envelope comprised.  *Honeywell v. Universal
Avionics Sys. Corp.,* 488 F.3d 982, 984 (Fed. Cir. 2007).  The district court adopted a
construction including some of the definition of the claim, but added additional limitations from
the specification.  *Id.*  The Federal Circuit reversed, holding that "one of skill in the art would
agree that the claim defines this term adequately" and that the district court erred in importing
other limitations.  *Id.* at 993.

Here, as in *Honeywell*, the '050 Patent uses a coined term—"speed reference"—to
describe an aspect of the invention, and specifically defines that term in the claims just as Apple
does: "said invocable speed reference <u>is a phone number</u>."  '050 Patent at 31:47 (emphasis
added).  Motorola's complaint that "the specification makes it clear that [the speed reference]
could be a reference like a web address" and that Apple's construction "excludes a [supposed]
preferred embodiment" is without merit.  Motorola Br. at 17.  While the specification describes
an embodiment where the speed reference can be a web address, the claims make clear that this
embodiment is not what is claimed.  There is no reason to construe "invocable speed reference"
to include something (a web address) that the claims themselves specifically foreclose.

Motorola's assertion that its own construction "is demonstrated by the claims
themselves" is wrong.  First, its construction does not require that the "reference" be invocable,
as the claims do; it improperly reads the word "invocable" out of the claims.  Second, the claims
do not support its "push" limitation.  Its only support for this is that "the asserted claims require
that the invocable speed reference is 'received' by the user's device." Motorola Br. at 12.  This
proves nothing.  There is no dispute that the invocable speed reference is, in fact, received; the
disputed "push" requirement would limit <u>how</u> it is received.  On this, the claims do nothing to

support Motorola: they use neither the word "push," nor anything resembling it.  And Motorola's assertion that "<u>none</u> of the claims describe a system in which the invocable speed reference is received in response to a query or any other user request" makes Apple's point.  Motorola Br. at 13.  The claims merely say that the speed reference is "received"; they do not require that it be <u>either</u> "pushed" or "received in response to a query."  The language of the claims encompasses both embodiments, and supports Apple's construction.

### b) Motorola's Construction Would Improperly Read A "Push" Limitation Into The Claims And Exclude A Preferred Embodiment.

Motorola's construction does not flow from the claims: it is an attempt to read a limitation from the specification into them.  It is bedrock law that courts "do not read limitations from the specification into claims."  *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1369 (Fed. Cir. 2012).  Neither the words "push," "proactive," "automatic," nor any synonym nor explanation of them, is found in the claims.  This concept is only in the specification.

Motorola attempts to justify its reading-in by asserting that "all applications of the 'present invention' involve a 'push' operation" and that "the '050 Patent specification does not describe a single example in which the content, or the invocable speed reference . . . is pulled in response to a user's search query."  Motorola Br. at 13, 15.  But the specification proves Motorola wrong many times over.  Indeed, the '050 Patent is riddled with examples where content is not "pushed" but provided in response to a query.  To start, the "Summary of the Invention," which Motorola relies on almost exclusively for its specification support, specifically says that one purpose of the invention is to provide a query functionality:

> Yet another <u>advantage of the present invention</u> is providing new and useful <u>query functionality</u> for <u>querying</u> the total number of known receiving data processing systems for a particular situational location, <u>querying any content configured for delivery</u> to a particular situational location with a comprehensive variety of query parameters, and <u>querying up to a maximum threshold number of deliverable content instances</u> for a particular location. . . . '050 Patent at 4:60-67.[16]

---

[16]Unless otherwise noted, all emphasis herein has been added.

Nor is this an isolated instance: the specification features over a dozen different descriptions of how the disclosed invention allows users to "query" for information, rather than have it "proactively" or "automatically" delivered to them.  For instance, the specification discloses:

- "[S]ituational location queries, [where] content is optionally retrieved by the location and descending locations . . . according to parameters."  '050 Patent at 14:60-63.

- An embodiment where if "the user selected to perform <u>a situational location query, then the user specifies validated parameters</u> (discussed with FIG. 15B) . . . [and t]hereafter, via a received system event, blocks 1318 and 1326 handle receipt, delivery, and RDPS user interface <u>presentation of the content</u>."  '050 Patent at 20:7-14.

- An embodiment where if "<u>the user selected to query</u> the number of known RDPS devices at a location(s) . . . block 1266 interfaces with the user to specify valid parameters including situational location information and time criteria . . . [and] a content <u>specification parameter may also be specified for retrieving the situational location content</u> as well."  '050 Patent at 20:18-25.

- An embodiment where if the user performs "<u>a situational location query</u>, then block 156 searches deliverable content database records 700 with parameters from the RDPS [user] . . . [and] [i]nformation for records found are transmitted as content to the RDPS at block 1558."  '050 Patent at 24:31-54; *see also id.* at 30:31-52.

- An embodiment where if the user performs a "<u>client count query request</u>, then block 1564 retrieves the known number of RDPS devices at the specified situational location."  '050 Patent at 24:56-58; *see also id.* at 30:56-31:6.

Similarly, the Figures of the '050 Patent repeatedly disclose providing content in response to a *query*, rather than "pushing" it to the user:



**Fig. 12B**                    **Fig. 15B**

41

'050 Patent at Figs. 12B, 15B; *see also id.* at Figs. 18B, 20B.  Each of these portions of the specification is flatly inconsistent with Motorola's push-only construction, which is yet another reason to reject it.  In contrast, Apple's construction—which would cover both "push" and "query" embodiments—is consistent with the specification.

### c)   Because The Query Embodiments Disclosed In The '050 Patent Are Part Of The Preferred Embodiment, Motorola's Construction Impermissibly Reads The Preferred Embodiment Out Of The Claims.

Motorola's claim that the '050 Patent does not describe examples of content being provided in response to a query actually ignores the inventor's preferred embodiment—indeed, Motorola's proposed construction would exclude that preferred embodiment.  It is black-letter law that "a claim construction that would exclude the preferred embodiment 'is rarely, if ever, correct and would require highly persuasive evidentiary support.'"  *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576,1583 (Fed. Cir. 1996)).  Here, as noted above, Figures 12B and 15B specifically disclose a query functionality.  The specification unambiguously describes these Figures as a preferred embodiment: "FIGS. 12A and 12B depict flowcharts for describing user event management processing aspects of *a preferred embodiment* of the RDPS of the present invention."  '050 Patent at 18:36-38.  Likewise, "FIGS. 15A, 15B, and 15C depict flowcharts for service event handling aspects *of a preferred embodiment* of the SDPS [server] of the present invention."  '050 Patent at 23:7-9.  Similarly, the specification's descriptions of a "situational location query" and a query where "the user selected to query the number of known RDPS devices at a location" are both included within part of a textual description of Figure 12's preferred embodiment.  '050 Patent at 18:36-38, 20:8, 20:19-20.

Motorola does not dispute—and indeed, affirmatively asserts—that its proposed push only construction would not cover the query functionality of these preferred embodiments.  Motorola Br. at 12, 14, 16-17.  It provides no reason, let alone a "highly persuasive" one, as to why such a construction should be adopted.

**d)  The Prosecution Of Other Patents That Share The Specification Confirm That Where The Patentee Intended To Limit His Claims To "Automatic" Receipt Of Information, He Did So Explicitly.**

Lacking any textual support in the specification or claim language, Motorola is essentially reduced to an argument that the concept of "push," or "automatic" sending of content, is somehow inherent in the claims because the "purpose" of the invention requires it to be that way.  But the patentee (and the Patent Office) did not agree.  When prosecuting other patents in the same family as the '050 Patent, and sharing the same specification, the patentee specifically recited a "push" or "automatic" receipt limitation in the claims when he wanted it to be there.  As the Federal Circuit has recognized, where "patents all derive from the same parent application and share many common terms, we must interpret the claims consistently across all [of those] patents."  *NTP Inc. v. Research In Motion Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005).  For instance, in *Kao Corp. v. Unilever U.S. Inc.*, the Federal Circuit found that, where one patent in a family contained claims specifically directed to a salt-based formulation of a certain chemical, other, generic claim terms directed to the chemical should not be construed as including this "salt."  441 F.3d 963 at 973, n. 5 (Fed. Cir. 2006).

Here, the "push" or "automatic delivery" limitation that Motorola insists is necessarily present in the '050 Patent's claims is one the patentee had to explicitly include in claims of related patents.  For instance, the '050 Patent claims priority to, and shares a specification with, U.S. Patent No. 6,456,234 ("the '234 Patent").  The claims of the '234 Patent, unlike those of the '050 Patent, specifically recite that the user's device automatically receives information from the server.  For instance, claim 14 of the '234 Patent describes a user device that includes a "means for automatically receiving delivery information for a set of delivery content from [a] server data processing system."  Ex. F, '234 Patent at 34:41-43.  Similarly, the '050 Patent claims priority to, and shares a specification with, U.S. Patent No. 7,187,997 ("the '997 Patent").  Claim 1 of the '997 Patent specifically sets forth the "push" or "automatic delivery" limitation that Motorola claims to be inherent in the invention, reciting "[a] method for automatically sending situational location dependent information to a mobile receiving system."  Ex. G, '997 Patent at 32:24-26.

The '234 and '997 Patents make clear that the patentee (and the Patent Office) understood that when he wanted to limit claims based on the '050 Patent's specification to "automatic" or "push" delivery, that limitation had to be specifically present in the claims.  This directly contradicts Motorola's insistence that "push" or "automatic" delivery is a necessary part of the claims because it is the "purpose of the invention" and again demonstrates that Motorola's proposed construction must be rejected.

### e)  Apple's Construction Is Consistent With The Purpose Of The Invention That Was Actually Claimed In The '050 Patent.

The real basis for Motorola's proposed construction, as its opening brief makes clear, is not the claims, specification, or file history.  Rather, Motorola relies on a false dichotomy between "pushing" and "proactive" or "automatic" delivery of content—concepts Motorola does not define—on the one hand, and situations where a user enters keywords to retrieve content, on the other.  By insisting that these concepts are mutually exclusive, Motorola hopes to suggest (without providing a sound legal basis) that the Court must choose between the two and thus slip a "push" limitation into the claims through the back door.

But Motorola's choice is a false one.

First, the specification provides good reason to believe that there is no inconsistency and that the references to "push" or "proactive delivery" in the specification must include the ability for a user to solicit content by typing in keywords.  For instance, the specification explicitly links the two concepts: "Interests field **906** contains one or more comma separated <u>user configured text strings used to match to the keywords field</u> **754**.  If used, only the user's interests, along with the RDPS situational location, will <u>cause proactive delivery</u> of associated content."  '050 Patent at 15:9-15 (emphasis added).  And the specification provides examples where, even in the "push" or "proactive" functionalities of the invention, content is often supplied in response to prompting by the user.  For instance, the user can "enable or disable the functionality as needed," and can thus solicit content by enabling the content delivery functionality when he wants to receive it.  *Id.* at 3:32-33.  Thus, the '050 Patent's use of "push" or "proactive delivery" is not limited to a

situation where the user sits idly by and receives content without any action on his part.  Rather, it discloses situations where the user "specifies interests that are matched to the keywords field . . . [to] cause delivery of associated content," for instance, by specifying an interest in "coffee." '050 Patent at 14:28-32.

Indeed, although Motorola chooses to ignore it, the specification's description of *when* content is delivered makes clear that content can be "pushed" in response to a user request.  The specification describes that a user can configure the server to "[d]eliver only when RDPS [user sytem] requests."  '050 Patent at 13:59-67.  The specification even provides an example where the user "establishes delivery" using the delivery activation settings(s) field, which will contain a bit mask with settable bits.  *Id*. at 13:57-67.  Moreover, the specification makes clear that the "RDPS request" for content is triggered when a user performs a query.  *Id.* at 20:7-11 ("If block 1256 determines the user selected to perform a situational location *query*, then the user specifies validated parameters . . . [t]hereafter, block 1260 communicates an appropriate formatted *request* to the SDPS.") (emphasis added).  If the claims are truly limited to a "push" embodiment, as Motorola insists, that embodiment includes the ability for the user to perform a query and receive content in response.

Moreover, even if Motorola were correct that, despite what the specification discloses, "push" and "query" are mutually exclusive, it cannot dispute that the specification also discloses "query" functionality.  Thus, even under Motorola's view of the world, the patentee disclosed multiple inventions:  some that are push-only, and some that also include query elements.  It is settled that a specification may describe multiple inventions and that, when it does so, statements relating to an unclaimed invention "are not relevant to the invention ultimately claimed in the patent."  *LG Elecs. Inc. v. Bizcom Elecs. Inc.*, 453 F.3d 1364, 1378 (Fed. Cir. 2006), *rev'd on other grounds by Quanta Computer v. LG Elecs.,Inc.*, 553 U.S. 617 (2008).  Here, the "push"-only invention—if it existed at all—is claimed in the family members of the '050 Patent, the '234 and '997 Patents, but not in the '050 Patent itself.  It has no part in the claims, and

Motorola's citations to parts of the specification arguing that it is a necessary part of the "invention" are talking about the wrong "invention," and thus irrelevant.

### 2.  The Term "Situational Location" Refers To Any Of The Properties Listed In Apple's Construction.

| Apple's Proposed Construction | Motorola's Proposed Construction |
|---|---|
| situational location: (a) location, (b) direction, (c) location and direction, (d) proximity to a location, (e) state change, (f) location and/or direction relative to a previous location and/or direction, (g) time criteria, (h) delivery activation settings, or (i) combinations thereof.<br><br>Apple contends that the remainder of this phrase, *e.g.*, the words "of a user," does not require construction. | situational location of a user:  one or more factors, including at least the current location of the user |

With respect to the term "situational location," the parties dispute whether a "situational location" must include a user's "current" location, as Motorola insists, or whether it can include other properties, such as direction, heading, and device state, that are specifically identified in the specification's description of the term, as Apple acknowledges.  The specification, the disclosed embodiments, and even the prosecution of related patents all support Apple's construction.

### a)  Apple's Proposed Construction Is Drawn Directly From The Specification, And Motorola Raises No Serious Objections To It.

As noted in Apple's opening brief, Apple's proposed construction is drawn directly from the Summary of the Invention in the specification.[17]  The Summary of the Invention states: "[t]he situational location of the remote data processing system may be its location, direction, location and direction, proximity to a location, state change, or location and/or direction relative to a

---

[17]Motorola's brief asserts that this construction "appears to be derived in part from the Abstract," (Motorola Br. at 20), ignoring the fact that the phrase cited by Apple appears in the Summary of the Invention.  This appears to be a result of the fact that Motorola's arguments with respect to other terms, such as "speed reference" tout the importance of statements made in the patents' Summary of the Invention, to the exclusion of all else, a position in significant tension with the one Motorola takes here.

previous location and/or direction, or combinations thereof." '050 Patent at 2:30-34.  Apple's proposed construction reproduces this list faithfully.  Motorola complains that the Summary of the Invention "merely provides an identification of what a situational location <u>may</u> include; it does not define the term."  Motorola Br. at 20.  It is not clear what Motorola means by this.  As an initial matter, the Summary does not define what the "situational location" may <u>include</u> but, by its own words, what the "situational location" "may <u>be</u>."  '050 Patent at 2:31.  Moreover, the Summary is clear: the "situational location . . . may be" any of the listed items.  It "may  be . . . [the device's] location."  But it also "may be . . . [the device's] direction."  It "may be . . . [the device's] state change."  Or it "may be . . . [the device's] direction relative to a previous direction."  The Summary of the Invention defines "situational location" by saying that it <u>may be</u> any of these—that is, any of a location, direction, state change, or direction relative to a previous location may be a state change.

Motorola is also wrong to complain that Apple "provides 'time criteria' and 'delivery activation settings' as examples of the situational location."  Motorola Br. at 20.  First, its argument that these criteria are not part of the situational location because "these factors are wholly divorced from the user's [current] location (*i.e.* place or position)" is circular.  The requirement that a "situational location" must include a "location (*i.e.* place or position)" is found only in Motorola's own construction, not in the claims, specification, or file history.  The failure of Apple's construction to agree with Motorola's is hardly a reason for rejecting it.

Second, Motorola's argument that "'time criteria' and 'delivery activation settings' are 'system delivery constraints,' not the 'situational location of a user," simply misunderstands the invention.  The specification is crystal clear that "time criteria" and "delivery activation settings" are part of the situational location: in one example, "[l]ocation field **704**, direction field **706**, time criteria field **708**, and delivery activation setting(s) field **718** together form the situational location information . . . which establishes delivery."  '050 Patent at 14:17-20.  It is true, as Motorola points out, that other parts of the specification describe the system delivery constraints as also including a time criteria and delivery activation settings.  But this makes perfect sense –

the purpose of system delivery constraints is that they serve as a filter for particular content, depending on the user's situational location.  '050 Patent at 2:34-3, 8:31-57.  The content is delivered <u>only if</u> the delivery constraints that have been specified for a particular piece of content match the user's current situational location.  *Id.*  For instance, if the user's situational location indicates that he is headed north at 10 p.m., but the delivery constraints for an ad indicate it only to be displayed during daylight hours, a match will not occur, and the content will not be delivered.  Since the purpose of a system delivery constraint is to be compared against the user's situational location to see if they match, it is not surprising that the two include the same fields.

### b)  Motorola's Construction Would Read Out Numerous Disclosed Embodiments In Which The "Situational Location" Does Not Include A User's Physical Location.

Motorola's attempt to limit the term "situational" location to information that must include a "current location" is based on its assertion that "each and every embodiment of the '050 Patent describes that the current location of the user is considered in providing an invocable speed reference to the user."  Motorola Br. at 19 (emphasis omitted).  As an initial matter, it is not clear what Motorola means by this, because none of the portions of the specification that Motorola quotes refer to an "invocable speed reference" being provided, in response to the user's location or otherwise.  Moreover, Motorola's underlying assumption—that every use of "situational location" in the patent's specification includes a user's current location—is wrong.  As noted above, the Summary of the Invention states: "[t]he situational location of the remote data processing system may be its location, direction, location and direction, proximity to a location, state change, or location and/or direction relative to a previous location and/or direction, or combinations thereof."  '050 Patent at 2:30-34.

And the '050 Patent describes several examples in which content is provided to a user in response to information other than the user's "current location."  For instance, the specification discusses a situation in which information is sent to a user based on the manner in which the user is travelling, such as their direction or speed: content will be delivered "when pedestrian **204**

becomes in a specified proximity to the Starbucks location, encounters a specific location, travels in a manner which provides predictive information, [or] heads in a specified direction at, to, or from a location." '050 Patent at 8:41-48. The specification describes other examples in which information is sent to all users whose devices are in an active state: "[t]he present invention enables the emergency broadcast to be immediately configured and then communicated to everyone with a[n] RDPS, for example with a wireless internet connection." *Id.* at 3:60-64. And the specification specifically describes candidate delivery events (CADEs), which are triggered by a change in the user's situational location, occurring in response to a change in the user's direction: "[i]f, at block 370, the direction did change, then a CADE is generated to the system event manager at block 372." *Id.* at 10:59-62. Accordingly, Motorola's insistence that content may be provided to a user only based upon his "current location" is unsupported by the specification.

### c)   Motorola's Requirement That A Situational Location Must Include A Current Location Is Inconsistent With The Prosecution Of Other Patents In The '050 Patent Family.

Finally, Motorola's insistence that the term "situational location" must include a user's "current location" is belied by claims of related patents that share the same specification and priority claim and specifically indicate that a "situational location" can be properties other than (and not including) a "current location." Where "patents all derive from the same parent application and share many common terms, we must interpret the claims consistently across all [of those] patents." *NTP Inc.*, 418 F.3d at 1293. Here, the '050 Patent claims priority to, and shares a specification with, U.S. Patent No. 6,731,238 ("the '238 Patent"). The '238 Patent uses many of the same terms as the '050 Patent, including the term "situational location," and thus "situational location" must mean the same thing in the '050 and '238 Patents. But the '238 Patent has numerous claims which require a "situational location" to be something other than the user's "current location." For instance, Claims 7, 20, 39, and 55 of the '238 Patent recite that the "situational location is a physical or logical network address," and Claims 29 and 62 recite that

the "situational location is a state change." Ex. H, '238 Patent at 32:57-59; 33:65-67; 34:27-28; 35:10-12; 36:31-33; 36:52-53. According to Motorola, neither a "physical or logical network address" nor a "state change" is a "current location of a user." Thus, in Motorola's world, the term "situational location" could not have the same definition in the '050 and '238 Patents, because in the '050 Patent, it would be required to include a "current location," but in the '238 Patent it could be, for instance, a "logical network address" alone. This is yet another reason why Motorola's construction should be rejected.

## IV.    CONCLUSION

For the aforementioned reasons, Apple's proposed constructions should be adopted.

DATED: August 29, 2013                    Respectfully submitted,

*/s/ Christopher R. J. Pace*
Christopher R. J. Pace
christopher.pace@weil.com
Edward Soto
edward.soto@weil.com
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
Telephone: (305) 577-3100
Facsimile: (305) 374-7159

*Attorneys for Apple Inc.*

*Of Counsel:*

Matthew D. Powers
Matthew.Powers@tensegritylawgroup.com
Steven Cherensky
Steven.Cherensky@tensegritylawgroup.com
Tensegrity Law Group LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone:  650-802-6000
Facsimile: 650-802-6001

Kenneth H. Bridges
kbridges@bridgesmav.com
Michael T. Pieja
mpieja@bridgesmav.com
3000 El Camino Real, 2nd Floor
Palo Alto, CA 94306
Telephone:  (650) 804-7800

Mark G. Davis
Brian E. Ferguson
Robert T. Vlasis
mark.davis@weil.com
brian.ferguson@weil.com
robert.vlasis@weil.com
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, N.W., Suite 900
Washington, DC 20005
Telephone: (202) 682-7000
Facsimile: (202) 857-0940

Anne M. Cappella
anne.cappella@weil.com
Jill J. Schmidt
jill.schmidt@weil.com
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to received electronically Notices of Electronic Filing.

*/s/ Christopher R. J. Pace*
Christopher R. J. Pace (Fla. Bar No. 0721166)

52

**SERVICE LIST**
**Motorola Mobility, Inc. versus Apple Inc.**
**Consolidated Case Nos. 1:12cv020271-Civ-RNS & 1:10cv235800Civ-RNS**
**United States District Court, Southern District of Florida**


Edward M. Mullins
Fla. Bar No. 863920
emullins@astidavis.com
ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.
701 Brickell Avenue, 16th Floor
Miami, FL 33131
Telephone: (305) 372-8282
Facsimile: (305) 372-8202

*Of Counsel:*
Charles K. Verhoeven
David A. Perlson
QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 93111
(415) 875-6600

Raymond N. Nimrod
Edward J. DeFranco
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

David A. Nelson
QUINN EMANUEL URQUHART & SULLIVAN, LLP
500 West Madison Street, Suite 2450
Chicago, IL 60661
(312) 705-7400

Moto-Apple-SDFL@quinnemanuel.com

*Attorneys for Motorola Mobility, Inc.*
Electronically served via ECF